**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| **Data PowerWorks, LLC,**<br><br>            Plaintiff,<br><br>**v.**<br><br>**Schneider Electric SE** and **Schneider Electric USA, Inc.,**<br><br>            Defendants. | **Civil Action No.**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Data PowerWorks, LLC ("Plaintiff" or "Data PowerWorks") files this complaint for patent infringement against Defendants Schneider Electric SE ("Schneider SE") and Schneider Electric USA, Inc. ("Schneider Inc.") (collectively, "Schneider" or "Defendants") for infringement of U.S. patent Nos. 9,000,613 (the "'613 patent"), 9,531,288 (the "'288 patent"), 7,960,862 (the "'862 patent"), and the 8,035,250 (the "'250 patent") (collectively, the "Asserted Patents"), pursuant to 35 U.S.C. § 271.

## PARTIES

1. Plaintiff Data PowerWorks, LLC is a limited liability company organized and existing under the laws of the State of Texas, having a principal place of business at 3300 Dallas Parkway, Suite 200, Plano, Texas 75093.

2. Defendant Schneider SE is a limited liability company organized and existing under the laws of France, having a principal place of business at 35 Rue Joseph Monier, 92500 Rueil Malmaison, France.

3. Defendant Schneider Inc. is a corporation organized and existing under the laws of Delaware, having a principal place of business at One Boston Place, Suite 2700, Boston,

Massachusetts, 02108.  Upon information and belief, Schneider Inc. is a wholly owned subsidiary of Schneider SE.

## JURISDICTION AND VENUE

4.  This patent infringement action arises under the patent laws of the United States, Title 35 of the United States Code ("U.S.C.") § 101 *et seq.*

5.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1338(a).

6.  Venue is proper in this District as to Schneider SE pursuant to 28 U.S.C. § 1391. Schneider SE is not a resident of the United States and thus "may be sued in any judicial district." 28 U.S.C. § 1391(c)(3).

7.  Venue is proper in this District as to Schneider Inc. pursuant to 28 U.S.C. §§ 1391 and 1400(b).  Schneider Inc. has admitted that it has a regular place of business within this District and that venue in this District is proper.  *Advanced Meter Systems, LLC v. Schneider Electric USA, Inc.*, C.A. No. 4:24-cv-489-SDJ, Dkt. No. 7 at 2-3 (EDTX Nov. 1, 2024) ("Schneider Electric admits that it has a regular place of business within the Judicial District" of the Eastern District of Texas, and that venue is proper).  Upon information and belief, Schneider Inc. has committed acts of infringement, directly and/or indirectly, in this District with respect to each asserted patent. Schneider Inc. has a regular and established place of business in this District, including sales offices located at 911 W. Loop 281, Suite 317, Longview, TX 75604 and 1650 West Crosby Rd., Carrollton, Texas 75006, and a warehouse and a logistics center located at 1651 Enterprise St., Athens, TX 75751.

8.  Schneider Inc.'s Carrollton, Texas sales office is pictured below:



9. Schneider Inc.'s Athens, Texas warehouse and logistics center is pictured below:



10.     This Court has personal jurisdiction over Schneider SE consistent with the principles of due process and the Texas Long Arm Statute.  Schneider SE infringes directly or through intermediaries, distributors, importers, customers, subsidiaries, and/or consumers, including its wholly owned subsidiary Defendant Schneider Inc., which maintains sales offices in this District in the cities of Longview and Carrollton at 911 W. Loop 281, Suite 317, Longview,

TX 75604 and 1650 West Crosby Rd., Carrollton, Texas 75006 and a warehouse and logistics center at 1651 Enterprise St., Athens, TX 75751.  Upon information and belief, Schneider SE shares resources with Schneider Inc. and obtains and reports consolidated revenue from sales in the United States, as disclosed in its Financial Information from 2024 and Annual Report from 2023.[1]  Schneider SE hires employees to work in location in Texas via its website, including for positions related to the power and grid market.[2]  In addition, Schneider SE and Schneider Inc. have overlapping officers. For example, Aamir Paul is the Executive Vice President of North America Operations, who sits on the Executive Committee of Schneider SE[3] and the North America Executive Team of Schneider Inc.[4]  Through direction and control, or in consort with subsidiaries, affiliates or intermediaries, including but not limited to Schneider Inc., some or all of which are Schneider SE's agents or alter egos, Schneider SE makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products and services within the State of Texas and this District that infringe one or more claims of the Asserted Patents, as alleged more particularly below.

11.    For example, Schneider SE sells and offers to sell infringing products and services through its website, https://www.se.com/us/en/, which may be accessed throughout the United

---

[1]    https://www.se.com/ww/en/assets/564/document/505646/release-fy-results-2024.pdf?p_en DocType=Financialrelease &p_File_Name=2024FYResults at 3-5 (disclosing North American and US revenues for Schneider SE); https://www.se.com/ww/en/assets/564/document/462018/2023-universal-registration-document.pdf?p_enDocType=Financial%20release&p_File_Name=Universal%20Registration%20Document%202023 at 506-507 (showing Schneider SE holds a 100% interest in 33 subsidiaries in the United States, including Schneider Inc).

[2]    https://www.se.com/ww/en/about-us/careers/job-details/solution-architect---power---grid/85796/

[3]    https://www.se.com/ww/en/about-us/company-profile/corporate-governance/executive-committee.jsp

[4] https://www.se.com/us/en/about-us/local/leadership-team/

States, the State of Texas, and this District.  In addition, Schneider SE, by way of its wholly owned subsidiary Schneider Inc., has at least 13 sales offices located throughout the State of Texas.  In addition, Schneider SE, itself or by way of its wholly owned subsidiary Schneider Inc.[5], maintains a significant manufacturing presence in El Paso, Texas.[6]  Schneider SE conducts business either directly or through its subsidiary Schneider Inc. at a data center integration facility located in Red Oak, Texas.[7]  Schneider SE has authorized sellers and sales representatives that offer and sell products accused of infringement in this Complaint throughout the State of Texas, including in this District, and to consumers throughout this Judicial District, such as: CED/Interstate Electric located at 1001 West Cotton, P.O. Box 911, Longview Texas 75604; Industrial Electronic Supply, Inc. located at 602 Roenia Cr., Longview, Texas 75604-5422; Wholesale Electric Supply Co. Inc. located at 1122 W.  Cotton St., Longview Texas, 75604, 201 Pope Street, Marshall, Texas 75670, and 3401 W. Shaw St., Tyler, Texas 75701; Dealers Electric Supply located at 506 West Houston St., Marshall, Texas 75670-3933 and 316 S. Palace, Tyler, Texas 75702.  Further, Schneider SE partners with third-party re-sellers located in this District related to its data center products such as: Cynergy Technology located at 3903 Timms, Tyler, Texas 75701 and Productive Solutions located at 3214 McDonald Rd, Tyler Texas 75701-6118.

---

[5]  https://www.se.com/ww/en/assets/564/document/463535/Integrated-report-2023.pdf?p_enDoc Type=Financial%20release&p_File_Name=Integrated%20report%202023  at  21  (describing Schneider SE's $300 million US manufacturing investment, with the latest opening in El Paso); https://www.se.com/ww/en/assets/564/document/505718/presentation-fy-results-2024.pdf?p_enDocType=EDMS&p_File_Name=2024%20Full%20Year%20Presentation  at  17 (showing increased capacity in Texas).

[6]  https://www.se.com/us/en/about-us/newsroom/news/press-releases/schneider-electric-unveils-latest-texas-manufacturing-plant-as-part-of-a-300-million-investment-in-u-s-manufacturing-650368ccd03d75ce2a01cca0.

[7]  https://www.se.com/us/en/about-us/newsroom/news/press-releases/schneider-electric-opens-data-center-integration-facility-in-red-oak-tx-66739ba970de4cb867027917.

12.     This Court has personal jurisdiction over Schneider Inc. consistent with the principles of due process and/or the Texas Long Arm Statute.  Schneider Inc. infringes directly or through intermediaries, distributors, importers, customers, subsidiaries, and/or consumers and maintains sales offices in this District located at 911 W. Loop 281, Suite 317, Longview, TX 75604 and 1650 West Crosby Rd., Carrollton, Texas 75006.  In addition, Schneider Inc. recently admitted that the Eastern District of Texas has specific and general personal jurisdiction over Schneider Inc. *Advanced Meter Systems, LLC v.  Schneider Electric USA, Inc.*, C.A.  No.  4:24-cv-489-SDJ, Dkt. No.  7 at 2-3 (EDTX Nov.  1, 2024) (admitting that the Eastern District of Texas has specific and general personal jurisdiction over Schneider Inc.).  Schneider Inc. sells and offers to sell infringing products and services throughout the State of Texas, including in this District, and introduces infringing products and services into the stream of commerce knowing that they will be sold in the State of Texas and this District.

13.     For example, Schneider Inc. sells and offers to sell infringing products and services through its website, https://www.se.com/us/en/, which may be accessed throughout the United States, the State of Texas, and this District.  Schneider Inc. has an extensive sales and manufacturing network throughout the State of Texas.[8]  Schneider Inc. has at least 13 sales offices located throughout the State of Texas.  In addition, Schneider Inc. maintains a significant manufacturing presence in El Paso, Texas.[9]  Schneider Inc. also conducts its business at a data

---

[8]     https://www.dallasnews.com/sponsored/2023/12/27/schneider-electric-surges-across-texas-creating-jobs-in-dallas-red-oak-and-el-paso/.

[9]     https://www.se.com/us/en/about-us/newsroom/news/press-releases/schneider-electric-unveils-latest-texas-manufacturing-plant-as-part-of-a-300-million-investment-in-u-s-manufacturing-650368ccd03d75ce2a01cca0.

center integration facility located in Red Oak, Texas.[10]  Schneider Inc. has authorized sellers and sales representatives that offer and sell products accused of infringement in this Complaint throughout the State of Texas, including in this District, and to consumers throughout this Judicial District, such as: CED/Interstate Electric located at 1001 West Cotton, P.O. Box 911, Longview Texas 75604; Industrial Electronic Supply, Inc. located at 602 Roenia Cr., Longview, Texas 75604-5422; Wholesale Electric Supply Co. Inc. located at 1122 W. Cotton St., Longview Texas, 75604, 201 Pope Street, Marshall, Texas 75670, and 3401 W. Shaw St., Tyler, Texas 75701; Dealers Electric Supply located at 506 West Houston St., Marshall, Texas 75670-3933 and 316 S. Palace, Tyler, Texas 75702.  Further, Schneider Inc. partners with third-party re-sellers located in this District related to its data center products such as: Cynergy Technology located at 3903 Timms, Tyler, Texas 75701 and Productive Solutions located at 3214 McDonald Rd, Tyler Texas 75701-6118.

## DATA POWERWORKS PATENTS

14.     Data PowerWorks owns the entire right, title, and interest in each of the Asserted Patents, including the right to seek damages for past and ongoing infringement of the Asserted Patents.

15.     Cloud computing is the backbone of the operation of most internet-based services today.  And the recent advancements in artificial intelligence have driven demand for these services.  This increasing demand for these critical technologies from companies and individuals alike means that reliable, effective, and efficient power management at data centers is central to the operation of these critical technologies.  Today, certain data centers handle power demands

---

[10]     https://www.se.com/us/en/about-us/newsroom/news/press-releases/schneider-electric-opens-data-center-integration-facility-in-red-oak-tx-66739ba970de4cb867027917.

exceeding 100 megawatts.  Accordingly, effective and efficient power management in data centers is needed to keep these critical technologies running.

16.     The Asserted Patents are directed to systems and methods involving Uninterruptible Power Supply ("UPS") and related equipment.  These instruments are critical to the power management of data centers, as they enable reliable, effective, and efficient supply of power to data center equipment.

### The '613 Patent

17.     The '613 patent issued on April 7, 2015.  A true and correct copy of this patent is attached hereto as Exhibit A.

18.     The '613 patent is entitled "UPS Adaptive Output Voltage Control Systems."  The named inventors are Russel E. Shetler, Jr. and David Sonner.  The '613 patent is valid and enforceable.

19.     The '613 patent addresses problems related to controlling the voltage of UPSs in, for example, a data center.  '613 patent at 1:14-16.  UPSs supply power to data centers, specifically to provide back-up power if there is a power interruption from the electric utility, or to condition the power from the electric utility.  *Id*. at 1:26-31.  To that end, UPSs typically have multiple modes of operations, and changes modes of operation if there is a power outage.  The '613 patent specifically discloses UPS equipment with changes in the modes with minimal disruption in power supply.

20.     For example, as the '613 patent explains, UPS systems "typically have a UPS mode and a bypass mode."  *Id.* at 1:57-58.  In the bypass mode, power is supplied "directly" from a utility company to the "load power supplies" of a data center.  *Id.* at 1:60-63.  However, power directly supplied from the utility company during the bypass mode is often provided at a lower

voltage level than in the UPS mode (for "maximum operating efficiencies of the load power supplies"). *Id.* at 2:4-9. As a result, when the UPS switches from the UPS mode to the bypass mode, "the output voltage of the UPS may suddenly drop." *Id.* at 2:9-16. This "sudden drop in voltage can negatively affect operation of the load power supplies." *Id.* at 2:16-18. At the same time, maintaining the output voltage of the UPS at the lower level of the bypass mode all the time prevents the load from operating at maximum efficiency. *Id*. at 2:23-25.

21.     The '613 patent's inventions solve the sudden voltage drop problem when switching to a bypass mode while also maintaining the maximum operating efficiency of a load power supply. Specifically, the '613 patent provides methods and systems for "adaptive voltage control," mode that can "adjust[] the second alternating current voltage between a first voltage level and a second voltage level after switching from the bypass mode to the UPS mode." *Id.* at 2:64-67. The '613 patent teaches the use of a "rectifier" and an "inverter," coupled to the UPS that adapts the alternating current of the UPS to operate at maximum efficiency when switching from the bypass mode to the UPS mode, and "ramps down" the operating alternate current voltage in the UPS mode when switching to a bypass mode. *See id.* at 9:4-49, 12:20-32, claims 1, 8.

22.     The claims of the '613 patent are directed to solving a technical problem that arises when there is a difference in voltage between power directly supplied by a utility and the maximum efficiency power output of a UPS. The '613 patent claims provide specific, inventive solutions using, for example, a control module operating in a bypass mode and a UPS mode, and when in the UPS mode, operating in an adaptive voltage control mode that prevents disturbances in the operation of a data center that can come from sudden drops in voltage. The claims of the '613 patent, among other things, overcome one or more problems in the prior art that existed when switching between sourcing power directly from the UPS and the utility that could result in sudden

drops or gains in voltage, thus negatively affecting operation of the load power supply.  Moreover, a person of ordinary skill in the art would understand the claims present advancements in the field and do not preempt all types of adaptive voltage control.  Accordingly, each claim of the '613 patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept.

### The '288 Patent

23.     The '288 patent issued on December 27, 2016.  A true and correct copy of this patent is attached hereto as Exhibit B.

24.     The '288 patent is entitled "Systems and Methods for Balancing UPS Output Voltages During Transitions Between Operating Modes."  The named inventors are Terry D. Bush, Brian P. Heber, and Russel E. Shetler, Jr.  The '288 patent is valid and enforceable.

25.     The '288 patent addresses problems related to balancing output voltages of an UPS. In a data center, different equipment can have power supplies that "operate over a range of input voltages." '288 patent at 1:39-41.  To address these different voltage demands, UPSs may operate in different modes with differing levels of efficiency and quality of power output.  *See id.* at 1:65-2:35.

26.     For example, the '288 patent discloses different, more efficient economy modes that allow for "less power [to be] consumed by the UPS" than when operating in a UPS mode, for example, by having a "rectifier of the UPS and the inverter … operating in an idle mode."  *Id.* at 2:13-14.  As another example, the '288 patent further describes an "economy mode" that allows for the UPS to "cancel harmonics," i.e., distorted electrical waves, in "power supplied by the bypass switch."  The '288 patent thus allows for different modes capable of conditioning and balancing output power in ways that "consum[e] less power than when operating in the UPS

10

mode." *Id.* at 2:29-35.  The '288 patent does so, for example, by way of a unique algorithm capable of repeatedly detecting the variable voltage output of the UPS, integrating those voltage outputs into a sum, and then using that sum to adjust the output voltage of the inverter after transitioning between UPS and bypass modes to allow for balancing the variable voltage of the UPS.  *Id.* at cl. 1.

27.    The claims of the '288 patent are directed to solving a technical problem that arises from the power supplied and used when operating a UPS.  The '288 patent claims provide specific, inventive solutions in creating idle modes and/or low-power modes of the UPS system by, for example, using the UPS system that is able to receive multiple sources of power, a bypass circuit, and a control module that is configured to detect a variable voltage at the output of the UPS, integrate the sum of the plurality of voltages, and, after transitioning between operating modes of the UPS, adjusting the output voltage of the inverter to balance the variable voltage of the UPS. These solutions create greater efficiencies in sourcing power to the data center as well as conditioning that power in a way that balances harmonics such that it allows for greater efficiencies during operation of a UPS mode.  The claimed solutions, among other things, overcome one or more problems in the prior art systems that operate at lower efficiencies, resulting in significant expense to the data center.  Moreover, a person of ordinary skill in the art would understand the claims present advancements in the field and do not preempt all types of output voltage balancing of an UPS.  Accordingly, each claim of the '288 patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept.

### The '862 Patent

28.     The '862 patent issued on July 14, 2011.  A true and correct copy of this patent is attached hereto as Exhibit C.

29.     The '862 patent is entitled "Method and System For High-Reliability Power Switching."  The named inventors are Michael V. Smith, Jason Cohen, and Gerard L. Cullen.  The '862 patent is valid and enforceable.

30.     The '862 patent addresses problems related to fast and "high-reliability power switching" between "two or more sources of electric power," such as for example, two UPSs connected in parallel.  *See* '862 patent at 1:6-7, 1:36-37.  For example, the patent states that "[t]raditionally, an electromechanical relay has been used as a simple 'either-or' mechanism that prevents both power sources to be selected simultaneously," but that these electromechanical relays "operate slowly."  *Id.* at 1:7-12.  This has led to the adoption of thyristor-type devices, solid-state switches such as triodes for alternating current ("TRIAC") and silicon-controlled rectifiers ("SCR") switches.  *See id.* at 1:14-21.  The '862 patent explains that a drawback to such triodes is the "lack of any inherent self-locking mechanisms to prevent[sic] multiple TRIAC regulating multiple power sources which are routed to a single load from being simultaneously enabled."  *Id.* at 1:21-24.

31.     The '862 patent solves this problem by teaching methods and systems for high-reliability power switching that employ, for example, a "master controller logic" that controls two or more thyristor switch controllers to "dictat[e] which controller is authorized to enable its associated TRIAC."  *Id.* at 4:21-25.  The '862 patent's solutions thus prevent "[w]iring and/or equipment damage" that "may result from inadvertent switching," *i.e.*, when multiple solid-state

relays that are inadvertently simultaneously enabled to a given load are "immediately disconnected by the circuit breakers." *Id.* at 21-29.

32.    The claims of the '862 patent are directed to solving a technical problem that arises when multiple solid-state relays are inadvertently, simultaneously used to regulate multiple power sources.  The '862 patent claims provide specific, inventive solutions that use, for example, a token-transfer method between the control logic of one or more solid-state thyristor-type switches based upon detected violations of a power source parameter.  These solutions allow for the UPS to achieve fast and reliable of power-switching with solid-state thyristor-type switches by employing, for example, a control logic that uses a "token" directly passed between the switch controllers and avoids an undesired simultaneous use of parallel circuits.  These solutions do not preempt the use of all techniques taught in the field, but, among other things, overcome one or more problems in the prior art.  Moreover, a person of ordinary skill in the art would understand the claims' subject matter presents advancements in the field and do not preempt all types of power switching.  Accordingly, each claim of the '862 patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept.

### The '250 Patent

33.    The '250 patent issued on October 11, 2011.  A true and correct copy of this patent is attached hereto as Exhibit D.

34.    The '250 patent is entitled "System and Method for Load Sharing in Multi-Module Power Supply Systems."  The named inventor is Richard T. Caudill.  The '250 patent is valid and enforceable.

35.    The '250 patent addresses mitigating overheating and stress that can arise from heavy use of a single UPS module that is a part of a multi-module power supply.  *See* '250 patent at 1:30-39.  For example, in a typical multi-module system, "[e]ach UPS is limited to operating within its thermal capability to prevent damage to its internal components." *Id.* at 1:30-33.  "When the internal temperature of a module reaches a maximum," then "that UPS module is disconnected (e.g., shut down) from the load until the problem is resolved." *Id.* at 1:33-35.  As a result, there will be a "loss of [a] redundant UPS module and/or an increase in the load for the UPS modules remaining connected to the load." *Id.* at 1:36-38.  This can "unnecessarily stress the remaining, operating UPS modules." *Id.* at 2:26-27.

36.    The '250 patent solves this problem by teaching methods and systems that allow for a "first power supply module" (i.e., first UPS) to shed "a portion of the load being handled" upon detection of an "operating event," i.e., an event that affects the operation of the first UPS such excessive heat.  *Id.* at 2:35-45.  When that operating event occurs, the '250 patent further teaches that a second power supply module (i.e., a second UPS) adapts to increase its power output to accommodate a "portion of the load that has been shed by the first power supply module." *Id.* at 2:46:50.  The claims of the '250 patent thus allow for the first power supply module to "operat[e] during the operating event but at a reduced power level," without "unnecessarily stress[ing] the remaining, operating UPS modules." *Id.* at 2:26-29, 2:43-45.  The '250 patent claims teach the specific, technical solution of distributing load to other UPS modules in a multi-module system based, for example, on a determination of the per-unit load capacity ("pc-u") of each individual UPS to prevent the shut-down or unnecessary stress to any single UPS module. *Id.* at 7:31-8:7.

37.    The claims of the '250 patent are directed to solving a technical problem that arises when a single UPS system in a multi-module system is unnecessarily stressed or shuts down due

to excessive thermal conditions.  The '250 patent claims provide specific, inventive solutions, such as, for example, by having three or more power supply modules, each of which has a controller. The controller can reduce  the output power of the first power supply module when it detects an operating event and shed a percentage of the load while remaining operational.  In addition,  the second and third power modules increase their respective power outlets, assuming different percentages of the load that was shed by the first power supply module.  The claimed inventive solutions thus create unique load sharing systems between UPS systems used in parallel that avoid complete shut-down of any single UPS while not overstressing other UPS systems that take on additional loads.  These solutions thus allow for the use of multiple UPS systems in a way that maintains stability of the multi-module system.  These solutions, among other things, overcome one or more problems in the prior art in which a single UPS system in a multi-module system could shut down or become inoperable due to stress.  Moreover, a person of ordinary skill in the art would understand the claims present advancements in the field and do not preempt all types of UPS load management.  Accordingly, each claim of the '250 patent recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept.

## ACCUSED INSTRUMENTALITIES

38.    Defendants make, use, sell, and/or offer to sell in, and/or import into, the United States products that implement or embody the Asserted Patents.

39.    Defendants' Accused Instrumentalities include, but are not limited to, Single and Three-Phase Uninterruptible Power Supply ("UPS") products and systems, associated transfer switches, as well as software relating to the control and management of data centers as described in more detail below and in the cited exhibits hereto.  On information and belief or unless otherwise

specified, the Accused Instrumentalities employ, implement or utilize materially the same UPS technology, switching technology, and/or data center software technology, such that facts material to infringement by one Accused Instrumentality will be material to all Accused Instrumentalities.

## CLAIMS FOR PATENT INFRINGEMENT

40.    As detailed below, each element of at least one claim of each of the Asserted Patents is literally present in the Accused Instrumentalities.  To the extent that any element is not literally present, each such element is present under the doctrine of equivalents.  Data PowerWorks' analysis below should not be taken as an admission that the preamble of the claims is limiting. While publicly available information is cited below, Data PowerWorks may rely on other forms of evidence to show infringement.

41.    Defendants have had actual notice and knowledge of the Asserted Patents no later than the filing of this complaint and/or the date this complaint was served upon Defendants.  On information and belief, Defendants continue without license to make, use, import/export into/from, market, offer for sale, and/or sell in the United States products that infringe the Asserted Patents.

42.    Defendants have directly and indirectly infringed and continue to directly and indirectly infringe the Asserted Patents by engaging in acts constituting infringement under 35 U.S.C. § 271.

43.    Upon information and belief, Defendants manufacture and sell the Accused Instrumentalities in the United States.

44.    Upon information and belief, Defendants import the Accused Instrumentalities and/or components into the United States.

45.    Defendants instruct their customers to use the Accused Instrumentalities in manners that infringe the Asserted Patents.  For example, Defendants provide instruction manuals for the

16

Accused Instrumentalities and describe, market, and/or advertise infringing functionality on its websites, when providing technical support over telephone or online, while hosting events and webinars on its technology and software services, and in other ways.

46.    Upon information and belief, Defendants test the Accused Instrumentalities in the United States, thereby infringing the Asserted Patents.  On information and belief, Defendants use the Accused Instrumentalities, thus infringing the Asserted Patents.

47.    Defendants' acts of infringement have caused damage to Data PowerWorks.  Data PowerWorks is entitled to recover from Defendants damages sustained by Data PowerWorks as a result of Defendants wrongful acts in an amount subject to proof at trial.

48.    Data PowerWorks has identified below at least one claim for each patent-in-suit to demonstrate infringement.    However, the selection of claims below should be considered exemplary and not limiting; additional claims of the Asserted Patents that are infringed by Defendants will be disclosed in compliance with the Court's rules and local patent rules of the Eastern District of Texas related to infringement contentions.    Further, the evidence of infringement below is exemplary only and should not be considered limiting.

## COUNT I: INFRINGEMENT OF THE '613 PATENT

49.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

50.    Defendants directly infringe (literally and/or under the doctrine of equivalents) the '613 patent by making, using, offering for sale, selling and/or importing into the United States products and/or methods covered by one or more claims of the '613 patent including at least the Accused Instrumentalities.

51.    For example, as shown below, the Accused Instrumentalities infringe at least claim 1 of the '613 patent.  The Accused Instrumentalities comprise "[a]n uninterruptible power supply," as shown below:



52.    The Accused Instrumentalities comprise "a rectifier coupled to an input of the uninterruptible power supply and converting a first alternating current having a first alternating current voltage to a direct current provided to a direct current bus," as shown below:



---

[11] https://www.se.com/us/en/product-category/8000-uninterruptible-power-supply-ups/.

[12]  https://download.schneider-electric.com/files?p_Doc_Ref=eConversion_EN&p_enDocType= EDMS at 5.

53.    The Accused Instrumentalities further comprise "an inverter coupled to an output of the uninterruptible power supply and converting direct current provided by the direct current bus to and second alternating current having a second alternating current voltage," as shown below:



54.    The Accused Instrumentalities further comprise, "a bypass switch having a bypass state and a non-bypass state, wherein the bypass switch is configured to bypass the rectifier and the inverter and provide a bypass voltage from the input to the output when in the bypass state," as shown below:

---

[13]    https://download.schneider-electric.com/files?p_Doc_Ref=eConversion_EN&p_enDocType=EDMS at 5.



55.     The Accused Instrumentalities further comprise "a control module that operates in a bypass mode and a UPS mode, wherein the control module switches the bypass switch to the bypass state when in the bypass mode and switches the bypass switch to the non-bypass state when in the UPS mode," as shown below:



---

56.    The Accused Instrumentalities comprise "a control module that switches the bypass

switch from the bypass mode to a non-bypass mode," as shown below: [16]



57.    The control module of the Accused Instrumentalities, "when in the UPS mode,

further operates in a normal UPS mode and an adaptive voltage control module, [where it] adjusts

the second alternating current from a first level to a second level upon switching from the bypass

mode to the UPS mode," as shown below:

---

[16]    https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf
at 84.

[17]    https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf
at 17.



58.    The Double Conversion mode is a UPS Mode that is also an adaptive voltage control mode as it "adjusts the second alternating current voltage from a first level to a second level," as shown below:

> In eConversion the UPS supplies the active part of the load through the static bypass as long as the utility/mains supply is within tolerance. The inverter is kept running in parallel so the input power factor of the UPS is maintained close to unity, regardless of the load power factor, as the reactive part of the load is significantly reduced in the UPS input current. In case of an interruption of the utility/mains supply, the inverter maintains the output voltage providing an uninterrupted transfer from eConversion to double conversion. The batteries are charged when the UPS is in eConversion mode and harmonics compensation is also provided.
>
> While the UPS is in eConversion, the bypass, inverter, and load LEDs are green, and the battery and input LEDs are off.

---

[18]    https://download.schneider-electric.com/files?p_Doc_Ref=eConversion_EN&p_enDocType= EDMS%20at%205.    *See also*    https://download.schneider-electric.com/doc/SPD_MBPN- 9Z9HTB_EN/990-5452M_EN.pdf at 16-21.

[19]    https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf at 16.

59.    Defendants had actual notice of the '613 patent and/or their infringing activities since prior to and no later than the filing of the Complaint.  For example, the application that issued as the '613 patent was cited by the U.S. Patent and Trademark Office ("USPTO") examiner during prosecution of Defendants' U.S. Patent No. 9,941,738 no later than June 22, 2016.  In addition, during prosecution of Defendants' U.S. Patent No. 10,566,834, the USPTO examiner rejected the Defendants' application claims over the '613 patent on April 22, 2019, which was the subject of an interview between Defendants and the examiner on July 16, 2019.[20]

60.    Defendants, with knowledge that the Accused Instrumentalities, or the use thereof, infringes the '613 patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '613 patent by providing these products to customers or end-users for use in an infringing manner in the United States, the State of Texas, and this District.

61.    Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including customers or end-users, infringe the '613 Patent, but while remaining willfully blind to the infringement.  For example, Defendants induce this direct infringement through its affirmative acts of manufacturing, selling, distributing, repairing, and/or otherwise making available the Accused Instrumentalities, and providing instructions, documentations, and other information to customers and end-users suggesting they use the Accused Instrumentalities in an infringing manner, including by providing technical support, online technical support, marketing, product manuals, advertisements, online documentation,

---

[20] U.S. Patent Nos. 9,941,738 and 10,566,834 are assigned to Schneider Electric IT Corporation. Upon information and belief, Schneider Electric IT Corporation is a subsidiary, affiliate, and/or agent of Defendants.

marketing materials, technical specifications, data sheets, we pages on its website, press releases, application notes, user manuals, and trade shows, including the documentation cited herein as exemplary evidence of infringement.  Defendants have and continue to induce infringement by its customers or end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants' websites, product literature and packaging, and other publications (including those cited in this Complaint).  Defendants also provide technical support and services to install the Accused Instrumentalities and set up customers or end-users to use the Accused Instrumentalities in an infringing manner.

62.    Defendants have induced and continues to induce its subsidiaries and affiliates, customers, and other third parties, such as resellers and end-consumers of Accused Instrumentalities, to directly infringe the '613 patent by making, using, selling, offering to sell, and/or importing into the United States the Accused Instrumentalities through affirmative acts.

63.    Defendants specifically intended and were aware that the ordinary and customary use of the Accused Instrumentalities would infringe the Asserted Patents.

64.    Defendants knew that the induced conduct would constitute infringement and intended said infringement at the time of committing the aforementioned acts, such that those acts and conduct have been and continue to be committed with the specific intent to induce infringement, or to deliberately avoid learning of the infringing circumstances at the time those acts were committed, so as to be willfully blind to the infringement they induced.

65.    Defendants took active steps to encourage end users to use and operate the Accused Instrumentalities, despite knowing of the '613 patent in the United States or willful blindness of the '613 patent, in a manner it knew directly infringes each element of the claims of the '613

patent.  Further, Defendants provided product manuals and other technical information that cause its subscribers, customers, and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '613 patent, through the normal and customary use of the Accused Instrumentalities.

66.     Upon information and belief, Defendants have contributed to the infringement by its customers of the '613 patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '613 patent both inside and outside the United States.  For example, the above-described products constitute a material part of the inventions of the '613 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use.  On information and belief, Defendants know that the above-described products constitute a material part of the inventions of the '613 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Defendants' customers directly infringe the '613 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products that contain the above-described products.

67.     Therefore, Defendants are liable for infringement of the '613 patent and that infringement has been and continues to be willful in nature.

68.     Data PowerWorks has incurred and will continue to incur substantial damages; and has been and continues to be irreparably harmed by Defendants' infringement.  Therefore, Data PowerWorks is entitled to an injunction, actual and/or compensatory damages, reasonable royalties, pre- and post-judgment interest, enhanced damages, attorney fees, and costs.

## COUNT II: INFRINGEMENT OF THE '288 PATENT

69.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

70.    Defendants directly infringe (literally and/or under the doctrine of equivalents) the '288 patent by making, using, offering for sale, selling and/or importing into the United States products and/or methods covered by one or more claims of the '288 patent including at least the Accused Instrumentalities.

71.    For example, the Accused Instrumentalities infringe at least claim 1 of the '288 patent.  The Accused Instrumentalities is "[a]n uninterruptible power supply," as shown below:



72.    The Accused Instrumentalities comprise "an input configured to (i) receive first power from a utility source to power at least one load, and (ii) receive second power from the utility source, wherein the at least one load is separate from the UPS," as shown below:

---

[21] https://www.se.com/us/en/product-category/8000-uninterruptible-power-supply-ups/



73.    The Accused Instrumentalities further comprise "an inverter configured to receive (i) when in a first mode, the first power and the second power, and (ii) when in a second mode, the second power and not the first power, wherein the second power is used to power the inverter" and "a bypass circuit connected to the input and configured to bypass the inverter to supply the first power to an output of the UPS when operating in the second mode," as shown below:

---

[22]   https://download.schneider-electric.com/files?p_Doc_Ref=eConversion_EN&p_enDocType=EDMS at 5.



74.    The Accused Instrumentalities further comprise "a bypass circuit connected to the input and configured to bypass the inverter to supply the first power to an output of the UPS when operating in the second mode," as shown below:

---

23    https://download.schneider-electric.com/files?p_Doc_Ref=eConversion_EN&p_enDocType=EDMS at 5.



75.    The Accused Galaxy V Series Instrumentalities further comprise "a control module configured to (i) detect a variable voltage at the output of the UPS a first plurality of times to provide a first plurality of voltages, (ii) Integrate the first plurality of voltages to generate a first sum, and (iii) subsequent to completing a transition from the second mode to the first mode, adjust an output voltage of the inverter based on the first sum to balance the variable voltage of the UPS, wherein the variable voltage of the UPS is provided based on the output voltage of the inverter," as shown below:

---

24  https://download.schneider-electric.com/files?p_Doc_Ref=eConversion_EN&p_enDocType=EDMS at 5.

**Output Quality Settings**

When operating in eConversion Mode the system output voltage is following the bypass voltage. To increase system transfer speed when a bypass waveform fault occurs, the bypass voltage fault detector has increased sensitivity. By this, a smaller waveform fault on bypass for a system in eConversion Mode will result in a transfer to double conversion.

To further improve the system ability to trace the bypass source and avoid transfers from eConversion Mode to double conversion due to small phase changes, the system frequency slew rate is defaulted to maximum level when in eConversion Mode. When the UPS returns to double conversion the user adjusted values are used.

[25]

**Operation Conditions and Behavior**

The UPS will transfer to eConversion mode only if it is enabled via a setting, the UPS has been in inverter operation for minimum 10 seconds and the bypass utility is within the configured tolerances. Furthermore, the UPS will evaluate the operational status of the battery and the power modules to determine if the conditions allow for operating in eConversion before transferring.

Should the operation conditions change while in eConversion, so that they are no longer optimal for this operation mode, the UPS will automatically transfer back to double conversion. This would for example be the case if the bypass utility becomes out of tolerance or the UPS output is overloaded. The UPS will automatically transfer back to eConversion again when the conditions allow for it.

If the UPS continuously transfers back and forth between eConversion and inverter operation, it indicates that the conditions are not optimal for operating in eConversion, and therefor eConversion mode will automatically be disabled by the system and the user will be notified via an alarm. The user can then manually re-enable eConversion again.

It is also possible to configure an input contact on the UPS to disable eConversion mode when the input contact is activated. This way an external system can temporarily prevent eConversion mode without disabling it permanently if there are situations where this is desired.

---

[25]  https://download.schneider-electric.com/files?p_Doc_Ref=SPD_COCR-9TZJGR_EN&p_en Doc Type=EDMS at 12

**eConversion activation guidelines**

| | eConversion Activation Guidelines | | | |
| | Favorable | Acceptable | Challenging | Comments |
|---|---|---|---|---|
| Single-unit or parallel system | Single-unit and Parallel | - | - | eConversion is well adapted to single-unit or parallel-unit systems. |
| Minimum load | > 10% | 5-10% | < 5% | If load level is too low, the system switches to Double Conversion. For Galaxy VL Parallel, check the detailed table in manual. |
| THDU fluctuation | < 5% | 5-8% | > 8% | In case of too high THDU, the system will go to Double Conversion. |
| Single or Dual feed | Single feed & Dual feed | - | - | eConversion is well adapted to both Single or Dual feed. |
| Voltage fluctuations | <5% | 5-10% | > 10% | Parameter – if voltage fluctuates more than the selected value, the system switches to Double Conversion. |
| Use of Genset | No Genset<br>Genset with dry contact | Genset without dry contact | | If using a Genset and Genset frequency fluctuations are high (due to downsizing), a dry contact input is recommended to disable automatically eConversion when Genset is On. |

**Figure 19:** Guidelines for when to activate eConversion. [26]

76.    Defendants had actual notice of the '288 patent and/or their infringing activities since prior to and no later than the filing of the Complaint. For example, Defendants disclosed the '288 patent to the USPTO during prosecution of Defendants' U.S. Patent No. 10,277,067 on December 22, 2017. In addition, during prosecution of Defendants' U.S. Patent No. 10,491,137 before the USPTO, the examiner cited to the '288 patent no later than April 30, 2019.[27]

77.    Defendants, with knowledge that the Accused Instrumentalities, or the use thereof, infringes the '288 patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '288 patent by providing these products to customers or end-users for use in an infringing manner in the United States, the State of Texas, and this District.

78.    Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including customers or end-users, infringe the '288 Patent, but while remaining willfully blind to the infringement. For example, Defendants induce this direct

---

[26]    https://download.schneider-electric.com/files?p_Doc_Ref=SPD_COCR-9TZJGR_EN&p_en Doc Type=EDMS at 14-15

[27]    U.S. Patent Application Nos. 10,277,067 and 10,491,137 are assigned to Schneider Electric IT Corporation. Upon information and belief, Schneider Electric IT Corporation is a subsidiary, affiliate, and/or agent of Defendants.

infringement through its affirmative acts of manufacturing, selling, distributing, repairing, and/or otherwise making available the Accused Instrumentalities, and providing instructions, documentations, and other information to customers and end-users suggesting they use the Accused Instrumentalities in an infringing manner, including by providing technical support, online technical support, marketing, product manuals, advertisements, online documentation, marketing materials, technical specifications, data sheets, we pages on its website, press releases, application notes, user manuals, and trade shows, including the documentation cited herein as exemplary evidence of infringement.  Defendants have and continue to induce infringement by its customers or end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants' websites, product literature and packaging, and other publications (including those cited in this Complaint).  Defendants also provide technical support and services to install the Accused Instrumentalities and set up customers or end-users to use the Accused Instrumentalities in an infringing manner.

79.    Defendants have induced and continues to induce its subsidiaries and affiliates, customers, and other third parties, such as resellers and end-consumers of Accused Instrumentalities, to directly infringe the '288 patent by making, using, selling, offering to sell, and/or importing into the United States the Accused Instrumentalities through affirmative acts.

80.    Defendants specifically intended and were aware that the ordinary and customary use of the Accused Instrumentalities would infringe the Asserted Patents.

81.    Defendants knew that the induced conduct would constitute infringement and intended said infringement at the time of committing the aforementioned acts, such that those acts and conduct have been and continue to be committed with the specific intent to induce

infringement, or to deliberately avoid learning of the infringing circumstances at the time those acts were committed, so as to be willfully blind to the infringement they induced.

82.    Defendants took active steps to encourage end users to use and operate the Accused Instrumentalities, despite knowing of the '288 patent in the United States or willful blindness of the '288 patent, in a manner it knew directly infringes each element of the claims of the '288 patent.  Further, Defendants provided product manuals and other technical information that cause its subscribers, customers, and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '288 patent through the normal and customary use of the Accused Instrumentalities.

83.    Upon information and belief, Defendants have contributed to the infringement by its customers of the '288 patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '288 patent both inside and outside the United States.  For example, the above-described products constitute a material part of the inventions of the '288 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use.  On information and belief, Defendants know that the above-described products constitute a material part of the inventions of the '288 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use.  On information and belief, Defendants' customers directly infringe the '288 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products that contain the above-described products.

84.    Therefore, Defendants are liable for infringement of the '288 patent and that infringement has been and continues to be willful in nature.

85.    Data PowerWorks has incurred and will continue to incur substantial damages; and has been and continues to be irreparably harmed by Defendants' infringement.  Therefore, Data PowerWorks is entitled to an injunction, actual and/or compensatory damages, reasonable royalties, pre- and post-judgment interest, enhanced damages, attorney fees, and costs.

### COUNT III: INFRINGEMENT OF THE '862 PATENT

86.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

87.    Defendants infringe (literally and/or under the doctrine of equivalents) the '862 patent by making, using, offering for sale, selling and/or importing into the United States products and/or methods covered by one or more claims of the '862 patent including at least the Accused Instrumentalities.  Upon information and belief, the Accused Instrumentalities are materially the same with respect to infringement of this patent.

88.    The Accused Instrumentalities infringe at least claim 1 of the '862 patent.  The Accused Instrumentalities practice "a method for high-reliability power switching," as shown below:

> The APC **NetShelter** Rack Automatic Transfer Switch (ATS) Fifth-Generation series is a range of high availability switches offering greater control of your IT equipment from Cloud to Edge. [28]

89.    The Accused Instrumentalities practice the step of "transferring possession of a token to first control logic controlling a first triode for alternating current (TRIAC), the first TRIAC operably coupled to a first power source," as shown below:

---

[28]    *See*  https://www.se.com/us/en/product-range/61810-rackmount-transfer-switches/?parent-subcategory-id=7440#products;    https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf    at    18;    https://www.productinfo.schneider-electric.com/galaxyvs_ul/990-91140_master-galaxy-vs-technical-specifications-ul/English/990-91140G_EN.pdf at 17.



90.  The Accused Instrumentalities practice the step of "applying a voltage to a gate of

the first TRIAC according to the possession of the token," as shown below:



Galaxy VS can support up to 4 UPSs in parallel for capacity and up to 3+1 UPSs in parallel for redundancy with individual unit input breaker UIB and static switch input breaker SSIB.

---

[29]  *See* https://download.schneider-electric.com/files?p_Doc_Ref=990-5844_EN&p_enDocType =User+guide&p_File_Name=Rack+Automatic+Transfer+Switch+%28ATS%29+AP44%E2%80 %A2%E2%80%A2+User+Guide_990-5844F-001.pdf    at    12;    https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf    at    18; https://www.productinfo.schneider-electric.com/galaxyvs_ul/990-91140_master-galaxy-vs-technical-specifications-ul/English/990-91140G_EN.pdf at 17.

91.    The Accused Instrumentalities practice the step of "detecting a violation of a power source parameter," as shown below:

---

30    https://download.schneider-electric.com/files?p_Doc_Ref=990-5844_EN&p_enDocType=User+  guide&p_File_Name=Rack+Automatic+Transfer+Switch+%28ATS%29+AP44%E2%80%A2%E2%80%A2+User+Guide_990-5844F-001.pdf   at   12;   https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf                         at                         18;  https://www.productinfo.schneider-electric.com/galaxyvs_ul/990-91140_master-galaxy-vs-technical-specifications-ul/English/990-91140G_EN.pdf at 17.

31    https://download.schneider-electric.com/files?p_Doc_Ref=990-5844_EN&p_enDocType=User+  guide&p_File_Name=Rack+Automatic+Transfer+Switch+%28ATS%29+AP44%E2%80%A2%E2%80%A2+User+Guide_990-5844F-001.pdf   at   12;   https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf                         at                         18;  https://www.productinfo.schneider-electric.com/galaxyvs_ul/990-91140_master-galaxy-vs-technical-specifications-ul/English/990-91140G_EN.pdf at 17.



92.    The Accused Instrumentalities practice the step of "transferring possession of the token to second control logic controlling a second TRIAC, the second TRIAC operably coupled to a second power source," as shown below:



93.    The Accused Instrumentalities further practice the steps of "removing the voltage from the gate of the first TRIAC" and "applying a voltage to a gate of the second TRIAC," as shown below:

---

32    https://download.schneider-electric.com/files?p_Doc_Ref=990-5844_EN&p_enDocType =User+  guide&p_File_Name=Rack+Automatic+Transfer+Switch+%28ATS%29+AP44%E2% 80%A2%E2%80%A2+User+Guide_990-5844F-001.pdf   at   12;   https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf                    at                    18; https://www.productinfo.schneider-electric.com/galaxyvs_ul/990-91140_master-galaxy-vs-technical-specifications-ul/English/990-91140G_EN.pdf at 17.

33    https://download.schneider-electric.com/files?p_Doc_Ref=990-5844_EN&p_enDocType= User+guide&p_File_Name=Rack+Automatic+Transfer+Switch+%28ATS%29+AP44%E2%80 %A2%E2%80%A2+User+Guide_990-5844F-001.pdf   at   12;   https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf                    at                    18; https://www.productinfo.schneider-electric.com/galaxyvs_ul/990-91140_master-galaxy-vs-technical-specifications-ul/English/990-91140G_EN.pdf at 17.



94.     Defendants had actual notice of the '862 patent and/or their infringing activities since prior to and no later than the filing of the Complaint.  For example, during prosecution of Defendant Schneider SE's European Patent Application No. 4,304,086, the examiner cited the '862 patent as relevant to prosecution of the application on October 25, 2023.

95.     Defendants, with knowledge that the Accused Instrumentalities, or the use thereof, infringes the '862 patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '862 patent by providing these products to customers or end-users for use in an infringing manner in the United States, the State of Texas, and this District.

96.     Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including customers or end-users, infringe the '862 Patent, but while remaining willfully blind to the infringement.  For example, Defendants induce this direct infringement through its affirmative acts of manufacturing, selling, distributing, repairing, and/or otherwise making available the Accused Instrumentalities, and providing instructions, documentations, and other information to customers and end-users suggesting they use the

---

34      https://download.schneider-electric.com/files?p_Doc_Ref=990-5844_EN&p_enDocType= User+guide&p_File_Name=Rack+Automatic+Transfer+Switch+%28ATS%29+AP44%E2%80 %A2%E2%80%A2+User+Guide_990-5844F-001.pdf    at    12;    https://download.schneider-electric.com/doc/SPD_MBPN-9Z9HTB_EN/990-5452M_EN.pdf    at    18; https://www.productinfo.schneider-electric.com/galaxyvs_ul/990-91140_master-galaxy-vs-technical-specifications-ul/English/990-91140G_EN.pdf at 17.

Accused Instrumentalities in an infringing manner, including by providing technical support, online technical support, marketing, product manuals, advertisements, online documentation, marketing materials, technical specifications, data sheets, we pages on its website, press releases, application notes, user manuals, and trade shows, including the documentation cited herein as exemplary evidence of infringement.  Defendants have and continue to induce infringement by its customers or end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants' websites, product literature and packaging, and other publications (including those cited in this Complaint).  Defendants also provide technical support and services to install the Accused Instrumentalities and set up customers or end-users to use the Accused Instrumentalities in an infringing manner.

97.     Defendants have induced and continues to induce its subsidiaries and affiliates, customers, and other third parties, such as resellers and end-consumers of Accused Instrumentalities, to directly infringe the '862 patent by making, using, selling, offering to sell, and/or importing into the United States the Accused Instrumentalities through affirmative acts.

98.     Defendants specifically intended and were aware that the ordinary and customary use of the Accused Instrumentalities would infringe the Asserted Patents.

99.     Defendants knew that the induced conduct would constitute infringement and intended said infringement at the time of committing the aforementioned acts, such that those acts and conduct have been and continue to be committed with the specific intent to induce infringement, or to deliberately avoid learning of the infringing circumstances at the time those acts were committed, so as to be willfully blind to the infringement they induced.

100.    Defendants took active steps to encourage end users to use and operate the Accused Instrumentalities, despite knowing of the '862 patent in the United States or willful blindness of the '862 patent, in a manner it knew directly infringes each element of the claims of the '862 patent.  Further, Defendants provided product manuals and other technical information that cause its subscribers, customers, and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '862 patent, through the normal and customary use of the Accused Instrumentalities.

101.    Upon information and belief, Defendants have contributed to the infringement by its customers of the '862 patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '862 patent both inside and outside the United States.  For example, the above-described products constitute a material part of the inventions of the '862 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use.  On information and belief, Defendants know that the above-described products constitute a material part of the inventions of the '862 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use.  On information and belief, Defendants' customers directly infringe the '862 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products that contain the above-described products.

102.    Therefore, Defendants are liable for infringement of the '862 patent and that infringement has been and continues to be willful in nature.

103.    Data PowerWorks has incurred and will continue to incur substantial damages; and has been and continues to be irreparably harmed by Defendants' infringement.  Therefore, Data

PowerWorks is entitled to an injunction, actual and/or compensatory damages, reasonable royalties, pre- and post-judgment interest, enhanced damages, attorney fees, and costs.

## COUNT IV: INFRINGEMENT OF THE '250 PATENT

104.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

105.    Defendants infringe (literally and/or under the doctrine of equivalents) the '250 patent by making, using, offering for sale, selling and/or importing into the United States products and/or methods covered by one or more claims of the '250 patent including at least the Accused Instrumentalities.

106.    For example, the Accused Instrumentalities infringe at least claim 1 of the '250 patent.  The Accused Instrumentalities is "[a] load sharing, multi-module power supply system for supplying power to a load," as shown below:



**Parallel Systems with Shared Unit Input Breaker UIB and Static Switch Input Breaker SSIB**

Galaxy VS can support up to 4 UPSs in parallel for capacity and up to 3+1 UPSs in parallel for redundancy with shared unit input breaker UIB and static switch input breaker SSIB.

**NOTE:** In parallel systems an external maintenance bypass breaker MBB must be provided and the internal maintenance breaker IMB* must be padlocked in the open position.

Parallel System – Single Mains

Parallel System – Dual Mains



**Example of Parallel System – Dual Mains**

---

35   https://www.productinfo.schneider-electric.com/galaxyvs_iec/990-91260_master-galaxy-vs-ups-with-internal-batteries-up-to-2-battery-strings/English/990-91260E_EN.pdf

36  https://media.dustin.eu/media/d200001001933074/schneider-electric-galaxy-vs-gvsups20 kb4h s-usermanual.pdf



107. The Accused Instrumentalities further comprise "a first power supply module having a controller and having a first per unit capacity (pu-c)", "a second power supply module having a controller and having a second per unit capacity (pu-c)", and "a third power supply module having a controller and having a third per unit capacity (pu-c)," as shown below:

## Output Specifications

**NOTE:** The number of output connections must match the number of input wires in a single mains system or bypass wires in a dual mains system.

| UPS rating | 10 kW | | 15 kW | 20 kW | |
|---|---|---|---|---|---|
| Voltage (V) | 200/208/220 | 380/400/415 | 380/400/415 | 380/400/415 | 480 |
| Connections | 4-wire (L1, L2, L3, N, G) | 4-wire (L1, L2, L3, N, PE) | | | 3-wire (L1, L2, L3, G, GEC⁵) or 4-wire (L1, L2, L3, N, G) |
| Output voltage regulation | Symmetrical load ± 1%<br>Asymmetrical load ± 3% | | | | |
| Overload capacity | 150% for 1 minute (in normal operation)<br>125% for 10 minutes (in normal operation)<br>125% for 1 minute (in battery operation)<br>For 200/208/220/480 V: 125% continuous (bypass operation)<br>For 380/400/415 V: 110% continuous (bypass operation)<br>1000% for 100 milliseconds (bypass operation) | | | | |

[37] https://download.schneider-electric.com/files?p_enDocType=User+guide&p_File_Name=990-91111K_EN.pdf&p_Doc_Ref=SPD_MPOD-AX5KFB_EN at 105

[38] https://www.productinfo.schneider-electric.com/galaxyvs_iec/990-91260_master-galaxy-vs-ups-with-internal-batteries-up-to-2-battery-strings/English/990-91260E_EN.pdf at 18.

108.    Upon information and belief, the Accused Instrumentalities further comprise a "controller of said first power supply module adapted to implement a reduction in an output power of said first power supply module upon the detection of an operating event, where a portion of said load being handled by said first power supply module is shed by a determined percentage, and such that said first power supply module remains operating during said operating event but at a reduced power output level," as shown below:



109.    Upon information and belief, the controllers of the first power supply modules in the Accused Instrumentalities comprise "upon the occurrence of said operating event, said controllers of said second and third power supply modules being adapted to increase their

39    https://www.productinfo.schneider-electric.com/galaxyvs_iec/990-91260_master-galaxy-vs-ups-with-internal-batteries-up-to-2-battery-strings/English/990-91260E_EN.pdf

respective said power outputs so that each of said second and third power supply modules accommodates a subportion of said portion of said load that has been shed by said first power supply module, and when needed, such that said controllers of said second and third power supplies increase the power outputs of their respective said power supply modules by different amounts, when needed, such that said second and third power supply modules assume different additional percentages of the load that was shed by the first power supply module," as shown below:



[40] https://media.dustin.eu/media/d200001001933074/schneider-electric-galaxy-vs-gvsups20 kb4h s-usermanual.pdf

[41]     https://www.productinfo.schneider-electric.com/galaxyvs_iec/990-91260_master-galaxy-vs-ups-with-internal-batteries-up-to-2-battery-strings/English/990-91260E_EN.pdf at 43.





110.  Defendants had actual notice of the '250 patent and/or their infringing activities

since prior to and no later than the filing of the Complaint.  For example, during prosecution of

---

42   https://www.se.com/us/en/product/GVSOPT006/parallel-communications-kit-for-galaxy-vs-easy-ups-3phase-modular-and-galaxy-px/ (product data sheet)

43  https://www.youtube.com/watch?v=JcpkPbL1cHw (Schneider Electric)

Defendants' World Intellectual Property Organization ("WIPO") Patent Application No. 2014/209,377, the application that issued as the '250 patent was listed by WIPO as relevant to prosecution of the application on December 13, 2013.[44]

111.    Defendants, with knowledge that the Accused Instrumentalities, or the use thereof, infringes the '250 patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '250 patent by providing these products to customers or end-users for use in an infringing manner in the United States, the State of Texas, and this District.

112.    Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including customers or end-users, infringe the '250 Patent, but while remaining willfully blind to the infringement.  For example, Defendants induce this direct infringement through its affirmative acts of manufacturing, selling, distributing, repairing, and/or otherwise making available the Accused Instrumentalities, and providing instructions, documentations, and other information to customers and end-users suggesting they use the Accused Instrumentalities in an infringing manner, including by providing technical support, online technical support, marketing, product manuals, advertisements, online documentation, marketing materials, technical specifications, data sheets, we pages on its website, press releases, application notes, user manuals, and trade shows, including the documentation cited herein as exemplary evidence of infringement.  Defendants have and continue to induce infringement by its customers or end-users by supplying them with instructions on how to operate the infringing

---

[44]  WIPO Patent Application Nos. 2014/209,377 is assigned to Schneider Electric IT Corporation. Upon information and belief, Schneider Electric IT Corporation is a subsidiary, affiliate, and/or agent of Defendants.

technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants' websites, product literature and packaging, and other publications (including those cited in this Complaint). Defendants also provide technical support and services to install the Accused Instrumentalities and set up customers or end-users to use the Accused Instrumentalities in an infringing manner.

113.    Defendants have induced and continues to induce its subsidiaries and affiliates, customers, and other third parties, such as resellers and end-consumers of Accused Instrumentalities, to directly infringe the '250 patent by making, using, selling, offering to sell, and/or importing into the United States the Accused Instrumentalities through affirmative acts.

114.    Defendants specifically intended and were aware that the ordinary and customary use of the Accused Instrumentalities would infringe the Asserted Patents.

115.    Defendants knew that the induced conduct would constitute infringement and intended said infringement at the time of committing the aforementioned acts, such that those acts and conduct have been and continue to be committed with the specific intent to induce infringement, or to deliberately avoid learning of the infringing circumstances at the time those acts were committed, so as to be willfully blind to the infringement they induced.

116.    Defendants took active steps to encourage end users to use and operate the Accused Instrumentalities, despite knowing of the '250 patent in the United States or willful blindness of the '250 patent, in a manner it knew directly infringes each element of the claims of the '250 patent. Further, Defendants provided product manuals and other technical information that cause its subscribers, customers, and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use, such that Defendants' customers and other

third parties have directly infringed the '250 patent, through the normal and customary use of the Accused Instrumentalities.

117.    Upon information and belief, Defendants have contributed to the infringement by its customers of the '250 patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '250 patent both inside and outside the United States.  For example, the above-described products constitute a material part of the inventions of the '250 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use.  On information and belief, Defendants know that the above-described products constitute a material part of the inventions of the '250 patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use.  On information and belief, Defendants' customers directly infringe the '250 patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products that contain the above-described products.

118.    Therefore, Defendants are liable for infringement of the '250 patent and that infringement has been and continues to be willful in nature.

119.    Data PowerWorks has incurred and will continue to incur substantial damages; and has been and continues to be irreparably harmed by Defendants' infringement.  Therefore, Data PowerWorks is entitled to an injunction, actual and/or compensatory damages, reasonable royalties, pre- and post-judgment interest, enhanced damages, attorney fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Data PowerWorks respectfully requests that this Court:

A.    Enter judgment in favor of Data PowerWorks that Defendants have infringed and continues to infringe each of the Asserted Patents, and that such infringement is willful;

B.      Award Data PowerWorks all monetary relief available under the laws of the United States, including but not limited to 35 U.S.C. § 284;

C.      Order Defendants to pay ongoing royalties in an amount to be determined for any continued infringement after the date of judgment;

D.      Declare this case exceptional and award Data PowerWorks its reasonable attorney fees under 35 U.S.C. § 285;

E.      Enjoin Defendants and its subsidiaries, and their officers, agents, servants, employees, and all persons in active concert with any of the foregoing from further infringement; and

F.      Grant Data PowerWorks all such other relief as the Court deems just and reasonable.

## DEMAND FOR JURY TRIAL

Data PowerWorks demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: March 13, 2025

Respectfully submitted,

*/s/ Andrea L. Fair*
Andrea Fair
Texas State Bar No. 24078488
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: (903) 757-6400
Fax: (903) 757-2323
andrea@millerfairhenry.com

Clement Naples
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

clement.naples@lw.com

S. Giri Pathmanaban (Texas Bar No. 24074865)
**LATHAM & WATKINS LLP**
300 Colorado Street
Austin, TX 78701
Telephone: (737) 910-7300
Facsimile: (737) 910-7301
giri.pathmanaban@lw.com

Thomas Yeh
**LATHAM & WATKINS LLP**
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 485-1235
thomas.yeh@lw.com

*Attorneys for Plaintiff Data PowerWorks, LLC*