**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **Data PowerWorks, LLC,**<br><br>       Plaintiff,<br><br>v.<br><br>**Schneider Electric SE** and **Schneider Electric USA, Inc.,**<br><br>       Defendants. | Civil Action No. 2:25-cv-300-JRG<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF DATA POWERWORKS, LLC'S
P.R. 4-5(a) OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.    LEGAL STANDARDS ......................................................................................... 2

III.   ASSERTED PATENTS........................................................................................ 3

IV.   DISPUTED TERMS............................................................................................ 4

    a.   '613 patent ..................................................................................................... 4

        i.    "bypass switch" ('613 patent at Claims 1, 5–8, 10, 11, 16, 18–20)............................. 4

        ii.   "when operating in the adaptive voltage control mode, adjusts the second alternating current voltage from a first level to a second level upon switching from the bypass mode to the UPS mode" ('613 patent at Claim 1) ....................................................................... 6

        iii.   "control module" ('613 patent at Claims 1–8, 10, 11)................................................ 8

    b.   '288 patent ................................................................................................... 11

        i.    "first power" ('288 patent at Claims 1, 2, 6, 13, 14, 15, 16, 17, 21) and...................... 11

        ii.   "second power" ('288 patent at Claims 1, 13, 16, 21)............................................... 11

        iii.   "an inverter configured to receive (i) when in a first mode, the first power and the second power, and; (ii) when in a second mode, the second power and not the first power, wherein the second power is used to power the inverter" ('288 patent at Claim 1) ............. 13

        iv.   "receiving, via an inverter, (i) the first power and the second power when in a first mode, and (ii), the second power and not the first power when in a second mode, wherein the second power is used to power the inverter" ('288 patent at Claim 16)........................ 15

        v.   "a control module configured to (i) detect a variable voltage at the output of the UPS a first plurality of times to provide a first plurality of voltages, (ii) Integrate the first plurality of voltages to generate a first sum, and (iii) subsequent to completing a transition from the second mode to the first mode, adjust an output voltage of the inverter based on the first sum to balance the variable voltage of the UPS, wherein the variable voltage of the UPS is provided based on the output voltage of the inverter" ('288 patent at Claim 1) .................. 15

    c.   '250 patent ................................................................................................... 18

        i.    "power supply module" ('250 patent at Claims 1–10) ............................................... 18

        ii.   "and when needed, such that said controllers of said second and third power supplies increase the power outputs of their respective said power supply modules by different amounts, [when needed]" ('250 patent at Claims 1 and 8)................................................ 21

    d.   '862 patent ................................................................................................... 23

        i.    "triode for alternating current (TRIAC)" ('862 patent at Claims 1, 2, 3, 9, 10, 12, 16, 18, 19) ......................................................................................................................... 23

        ii.   "token" ('862 patent at Claims 1, 2, 3, 6–13, 16–19) ................................................. 24

        iii.   "first controller logic" and "second controller logic" ('862 patent at Claim 19)...... 26

V.    CONCLUSION ........................................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aventis Pharms. Inc. v. Amino Chems. Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013)..............................................................................................2

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
783 F.3d 1374 (Fed. Cir. 2015)..............................................................................................7

*Cont'l Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019)..............................................................................................24

*Mad Dogg Athletics, Inc. v. Peloton Interactive, Inc.*,
No. 2:20-cv-00382-JRG, 2021 WL 3200994 (E.D. Tex. July 28, 2021)...............................10

*Mass. Inst. of Tech. & Elecs. For Imaging, Inc. v. Abacus Software*,
462 F.3d 1344 (Fed. Cir. 2006)............................................................................................27

*Metaswitch Networks Ltd. v. Genband US LLC*,
No. 2:14-cv-744-JRG-RSP, Dkt. 136 (E.D. Tex. Aug. 10, 2015) ..........................................20

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011)................................................................................................................22

*Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*,
122 F.4th 860 (Fed. Cir. 2024) ............................................................................................24

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)................................................................................................................2

*NextGen Innovations, LLC v. Fujitsu Network Commc'ns, Inc.*,
2:22-cv-00307-JRG-RSP, Dkt. 235 (E.D. Tex. Dec. 22, 2023) ...................................9, 17, 19

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)......................................................................2, 9, 25

*Power-One, Inc. v. Artesyn Techs., Inc.*,
599 F.3d 1343 (Fed. Cir. 2010)..............................................................................................5

*Skky, Inc. v. MindGeek, s.a.r.l.*,
859 F.3d 1014 (Fed. Cir. 2017)..............................................................................................3

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017)..................................................................................2

*Thorner v. Sony Computer Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)................................................................................25

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997)..................................................................................5

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) (en banc)......................................................... *passim*

*Zeroclick, LLC v. Apple Inc.*,
  891 F.3d 1003 (Fed. Cir. 2018)..........................................................................19, 27

**Federal Statutes**

35 U.S.C. § 112............................................................................................ *passim*

iv

Pursuant to Local P.R. 4-5(a) and the Third Amended Docket Control Order (Dkt. 45), Plaintiff Data PowerWorks LLC ("DPW") hereby submits this opening claim construction brief.

## I.  INTRODUCTION

Just months ago, Schneider told the Patent Office one thing.  Now it tells this Court the opposite.  In four *ex parte* reexamination petitions filed against the four Asserted Patents in late 2025 and early 2026, Schneider identified no terms for construction and invoked no § 112(f). Instead, Schneider's own retained experts parsed the very limitations Schneider now attacks as indefinite or lacking sufficient structure and mapped each, element by element, onto identifiable structures in the prior art.  *See* Ex. 1 ('613 patent EPR Request); Ex. 2 ('288 patent EPR Request); Ex. 3 ('250 patent EPR Request); Ex. 4 ('862 patent EPR Request).  Schneider now demands construction of thirteen terms across those same four patents—invoking § 112(f) and indefiniteness on terms its own experts treated as structural in the EPR record, and injecting narrowing limitations that contradict the claim language and the specification.

Schneider's positions fall into three categories—each flawed.  *First*, Schneider invokes § 112(f) on four structural terms—"control module" (the '613 and '288 patents), "power supply module" (the '250 patent), and "controller logic" (the '862 patent).  Each term, read against the claims and specifications, connotes definite structure to a POSA, and the '613 and '288 patents expressly define "module" to include ASICs, FPGAs, processors, and other identifiable hardware. Schneider produces no expert testimony to the contrary.  The only expert testimony on this point comes from Schneider's own retained witnesses, who treated each term as structural and purported to map each onto specific hardware in the prior art.  Section 112(f) does not apply.

*Second*, Schneider labels three limitations indefinite—the "adaptive voltage control mode" transition in the '613 patent, the "first power" and "second power" inverter modes in the '288 patent, and the "when needed" load-sharing limitation in the '250 patent.  Yet Schneider's own

1

experts parsed each limitation, element by element, and purported to apply each to the prior art in sworn declarations with no trouble. None hinted at indefiniteness. Schneider produces no contrary expert testimony in this Court. It cannot carry its clear-and-convincing burden on a record where its own witnesses have already proved the opposite.

*Third*, Schneider imports limitations into terms that need no construction. For example, it recasts "bypass switch" in the '613 patent with redundant words that introduce ambiguity, bolts unclaimed structural attributes onto the '862 patent's "TRIAC," and "token," narrowing them beyond anything the intrinsic record supports.

Schneider has already shown the Court the right answer—when it was speaking to the Patent Office. The Court should adopt that answer here and give each disputed term its plain and ordinary meaning.

## II.    LEGAL STANDARDS

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

35 U.S.C. § 112, ¶ 2 requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[T]he definiteness requirement must take into account the inherent limitations of language." *Id.* at 909. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

There is a rebuttable presumption that § 112(f) does not apply when the word "means" is absent from the claim.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc).  That presumption can be overcome "if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Id.*  "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id.*  A term may connote structure "even if the term covers a broad class of structures and even if the term identifies the structures by their function."  *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017).

## III.    ASSERTED PATENTS

Four patents are asserted here: U.S. Patent Nos. 9,000,613 (the "'613 patent"), 9,531,288 (the "'288 patent"), 8,035,250 (the "'250 patent"), and 7,960,862 (the "'862 patent") (collectively, the "Asserted Patents").  Each relates to Uninterruptible Power Supply ("UPS") systems and related equipment that ensure reliable, continuous power delivery to critical loads, such as servers, and sensitive electronic equipment in data centers.

The '613 patent, titled "UPS Adaptive Output Voltage Control Systems," addresses UPS voltage control.  When a UPS switches from UPS mode to bypass mode, the output voltage may suddenly drop from an efficient voltage level to a static bypass voltage, disrupting downstream systems.  Ex. 5 ("'613 patent") at 2:4–18.  The patent solves this through, among other things, an adaptive voltage control mode that prevents disturbances caused by sudden voltage drops.  '613 patent at 2:44–49.

The '288 patent, titled "Systems and Methods for Balancing UPS Output Voltages During Transitions Between Operating Modes," addresses imbalances between the positive and negative voltage cycles provided to loads connected to a UPS.  Ex. 6 ("'288 patent") at 1:39–49, 4:30–36.

3

It solves this through, among other things, a control module that detects a variable voltage at the UPS output, integrates the sum of those voltages, and—after transitioning between UPS operating modes—adjusts the inverter's output voltage to balance the UPS's variable voltage.  '288 patent at 2:51–57.

The '250 patent, titled "System and Method for Load Sharing in Multi-Module Power Supply Systems," addresses load sharing among multiple power supply modules—in particular, the problem that arises when a single UPS in a multi-module system experiences an operating event and becomes unnecessarily stressed.  Ex. 7 ("'250 patent") at 2:19–29.  It solves this through, among other things, three or more power supply modules, each with a controller that reduces the output power of the affected module and sheds a percentage of the load to the other UPSs while the system remains operational.  '250 patent at 2:51–3:3.

The '862 patent, titled "Method and System For High-Reliability Power Switching," addresses switching between two or more sources of electric power—including the risk that "[i]f multiple TRIACs coupled to dissimilar power sources are enabled simultaneously for a given load, the circuit may be immediately disconnected by the circuit breakers."  Ex. 8 ("'862 patent") at 1:6–7, 25–29, 36–37.  It solves this through, among other things, token-based control logic and triodes for alternating current ("TRIAC") that ensure reliable power switching without simultaneously enabling multiple power sources.  '862 patent at 1:38–49.

## IV.    DISPUTED TERMS

### a.  '613 patent

#### i.  "bypass switch" ('613 patent at Claims 1, 5–8, 10, 11, 16, 18–20)

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "bypass device for opening or closing a circuit" |

"Bypass switch" needs no construction beyond its plain meaning—the very position

4

Schneider itself took in its EPR.  The claim language provides context, and a POSA reading it would understand the term immediately.

The claims recite the "bypass switch" has "a bypass state and a non-bypass state" and is "configured to bypass the rectifier and the inverter and provide a bypass voltage from the input to the output when in the bypass state."  '613 patent at Claim 1.  The specification consistently reinforces this understanding, explaining that "[w]hile in bypass state, the bypass switch 26 provides AC power having the first AC voltage $V_{ACIN}$ directly from the main AC source to the output 42 of UPS 12 and thus directly to the load 14."  '613 patent at 6:22–25.  The specification further confirms that the bypass switch "is connected in parallel with the input transformer 28, the rectifier 20, the inverter 22, and the output transformer 30" and operates in conjunction with a "bypass control signal BYPASS."  *Id.* at 6:16–21.  The claim term requires no further elaboration as the intrinsic record confirms its ordinary usage through repeated, consistent description.  *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("When construing claims, the intrinsic evidence is the primary resource.").

Schneider's rewrite—"bypass device for opening or closing a circuit"—fails for three reasons.

*First*, Schneider swaps one word ("switch") for seven ("device for opening or closing a circuit") and adds nothing but ambiguity.  "Claim construction … is not an obligatory exercise in redundancy."  *Arigna Tech. Ltd. v. Nissan Motor Co.*, No. 2:22-cv-00126-JRG-RSP, 2022 WL 1449701, at *3 (E.D. Tex. May 9, 2022) (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

*Second*, Schneider's gloss strips out structural attributes a POSA understands as inherent in a "switch"—a component that rapidly transitions between two defined states.  *See, e.g.*, '613

patent at 13:38–42 ("the bypass switch module 140 switches the bypass switch 26 from its non-bypass state to its bypass state").  Substituting different words that obscure rather than illuminate is not claim construction.

*Third*, Schneider's gloss divorces the term from its context.  The intrinsic record uses the complete phrase "bypass switch" throughout, and the component's "bypass" function—providing power directly from input to output while bypassing the rectifier and inverter—is inseparable from its "switch" functionality of transitioning between bypass and non-bypass states.  *See* '613 patent at 2:57–63.

The Court should give "bypass switch" its plain and ordinary meaning.

> ii. **"when operating in the adaptive voltage control mode, adjusts the second alternating current voltage from a first level to a second level upon switching from the bypass mode to the UPS mode" ('613 patent at Claim 1)**

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning<br><br>Not indefinite | Indefinite |

Schneider's indefiniteness theory contradicts its own EPR record.  It has no expert testimony that this claim is indefinite.  Just as telling, Schneider petitioned for reexamination of the '613 patent.  It parsed the limitation and applied it to the prior art—element by element—through Dr. Baker's sworn declaration.  *See* Ex. 1 ('613 patent EPR Request) at 19–20; Ex. 9 ('613 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 40–42.  Dr. Baker swore that the prior art reference, Colombi, "describes a control module that, when operating in the adaptive voltage control mode, adjusts the second alternating current voltage from a first level to a second level upon switching from the bypass mode to the UPS mode"—tracking the limitation verbatim—and identified the specific Colombi structures that, in his view, satisfied each component.  Ex. 9 ('613 patent EPR

Decl. of Dr. R. Jacob Baker) ¶¶ 40–42.  A limitation Schneider's own expert read, understood, and applied under oath cannot also be too indefinite for a POSA to comprehend.

The claim language is plain on its face.  When the control module operates in the adaptive voltage control mode, it "adjusts the second alternating current voltage from a first level to a second level upon switching from the bypass mode to the UPS mode."  That is a straightforward operational sequence—a voltage adjustment performed at a defined mode transition—well within the technical understanding of a POSA in power-supply systems.

The specification confirms what the claim already makes plain, identifying the "first level" as, for example, the static bypass voltage, and the "second level" as the efficient voltage level.  '613 patent at 6:40–45 ("When the UPS 12 is in the adaptive voltage control mode, the UPS control module 18 may increase (or ramp up) the AC output voltage $V_{ACOUT}$ from a static bypass voltage to a set adaptive voltage and/or decrease (or ramp down) the AC output voltage $V_{ACOUT}$ from the set adaptive voltage to the static bypass voltage.  The set adaptive voltage may for example be the efficient voltage level[.]").  A POSA reading that example in the disclosure understands precisely what the limitation requires.  *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015) ("[I]f the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite").

The prosecution history closes the loop.  The Examiner allowed the claims with no indefiniteness rejection and no amendment to the "adaptive voltage control mode" limitation.  *See* Ex. 10 ('613 patent File History), Non-final Office Action dated December 5, 2014, at 2; Notice of Allowability dated January 22, 2015, at 2.  Schneider now asks this Court to do what neither the Examiner, Schneider itself, nor Schneider's own EPR expert thought necessary—declare the limitation incomprehensible.  It cannot have it both ways.  Either the limitation is definite enough

for Dr. Baker to apply it claim-element-by-claim-element under oath weeks before Schneider's preliminary constructions in this case, or it is not. Perhaps most tellingly, Schneider produces no expert testimony in this Court, and bears the burden of proving indefiniteness by clear and convincing evidence. It cannot meet that burden when its own witness has already proved the opposite.

The Court should reject Schneider's indefiniteness theory and give this term its plain and ordinary meaning.

### iii. "control module" ('613 patent at Claims 1–8, 10, 11)

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning<br><br>Not subject to 112(f)<br><br>To the extent the Court treats this term as subject to 112(f), DPW identifies the following function and structure:<br><br>**Function**: "that operates in a bypass mode and a UPS mode, wherein the control module switches the bypass switch to the bypass state when in the bypass mode and switches the bypass switch to the nonbypass state when in the UPS mode"<br><br>**Alternative Structure**: Any one of an ASIC, an electronic circuit, a combinational logic circuit, an FPGA, a processor (shared, dedicated, or group) that executes code, memory that stores code executed by the processor, other suitable hardware components, or a combination thereof, such as in a system-on-chip, programmed or configured to perform the recited control functions; and equivalents thereof. *See, e.g.*, '613 Patent at 3:53–62. | Means-Plus-Function Term, subject to 112(f)<br>"module" is a nonce term<br><br>**Function**: "that operates in a bypass mode and a UPS mode, wherein the control module switches the bypass switch to the bypass state when in the bypass mode and switches the bypass switch to the non-bypass state when in the UPS mode"<br><br>**Structure**: UPS control module 18 |

When Schneider filed its *ex parte* reexamination, it treated "control module" as a structural

8

term.  Now it tells this Court the term is a § 112(f) term.  The first position is right; the second is a litigation invention.  The term does not use the word "means," which triggers a rebuttable presumption against § 112(f).  *Williamson*, 792 F.3d at 1349.  Schneider bears the burden of overcoming that presumption, and on this record it cannot.  In its January 12, 2026 EPR Request, Schneider repeatedly mapped the "control module" limitations of claim 1 onto Colombi's "control system 175"—a discrete hardware unit Colombi describes as "a processing circuit 180 and a storage medium 185."  Ex. 1 ('613 patent EPR Request) at 18 (quoting Colombi at 3:48–52); *see also* Ex. 9 ('613 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 40–42, 57–59.  Dr. Baker relied on that structural mapping under oath to opine that Colombi's control system anticipates or renders obvious every "control module" limitation.  At no point in the EPR did Schneider call "control module" a nonce term, deny it had structural meaning, or invoke § 112(f), something it could have done if it truly believed it.

The claim language reinforces that "control module" is not "a purely functional placeholder in which structure is filled in by the specification."  *Phillips*, 415 F.3d at 1311.  This Court has already so held.  In *NextGen Innovations, LLC v. Fujitsu Network Commc'ns, Inc.*, this Court found a patent's "control module" term "not subject to means-plus-function claiming" because, "read in the context of the complete claim language," it "recites structure in support thereof."  No. 2:22-cv-00307-JRG-RSP, Dkt. 235, at 29–31 (E.D. Tex. Dec. 22, 2023).  The same reasoning applies here—with even greater force.  Claim 1 places the "control module" squarely within a defined UPS architecture, alongside named structural co-components: "a rectifier coupled to an input" of the UPS, "an inverter coupled to an output," of the UPS, and a "bypass switch … configured to bypass the rectifier and the inverter."  '613 patent at Claim 1.  The claims further specify the control module's structural relationship to those components, reciting that the control

9

module "switches the bypass switch to the bypass state when in the bypass mode and switches the bypass switch to the non-bypass state when in the UPS mode." *Id.* The dependent claims add still more structural context: the control module's interaction with a "fault detection module" that generates a fault signal (claims 4–5) and an "interface module" that generates a control signal and an enable signal (claim 10). These recitations describe a defined hardware element with identified inputs (control signal, enable signal, and fault signals), identified outputs (commands to the bypass switch), and identified relationships to named structural components. That is structure—not an abstract functional black box. *See Mad Dogg Athletics, Inc. v. Peloton Interactive, Inc.*, No. 2:20-cv-00382-JRG, 2021 WL 3200994, at *15 (E.D. Tex. July 28, 2021) (computer code "configured to" perform functions is not 112(f) because the claim language showed how the computer was connected to other "structural elements and how it interacts with those elements to form the claimed bike").

Read as a whole, "control module" connotes structure.

The specification removes any doubt by acting as its own lexicographer. It defines "module" expressly: "the term module may refer to, be part of, or include an Application Specific Integrated Circuit (ASIC); an electronic circuit; a combinational logic circuit; a field programmable gate array (FPGA); a processor (shared, dedicated, or group) that executes code; other suitable hardware components that provide the described functionality; or a combination of some or all of the above, such as in a system-on-chip." '613 patent at 3:53–60. Each item on that list is a specific, well-known class of structure a POSA recognizes immediately. Schneider and Dr. Baker had no trouble recognizing it in the EPR—they mapped that very class onto Colombi's "control system 175" with its "processing circuit" and "storage medium." Ex. 9 ('613 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 40–42. Schneider produces no expert testimony in this Court that

a POSA would not understand the term to connote structure.  Its silence is unsurprising: its own expert recently testified to the contrary.

Schneider cannot rebut the presumption against § 112(f) when (1) the specification expressly defines "module" in structural terms, (2) the claims situate the control module within a defined UPS architecture alongside named structural co-components, and (3) Schneider itself treated the term as structural in its own EPR filings.  The Court should hold that "control module" is not subject to § 112(f) and should give it its plain and ordinary meaning.

### b.  '288 patent

i.  **"first power" ('288 patent at Claims 1, 2, 6, 13, 14, 15, 16, 17, 21) and**

ii.  **"second power" ('288 patent at Claims 1, 13, 16, 21)**

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning<br><br>Not indefinite | Indefinite |

"First power" and "second power" are not indefinite, and Schneider knows it.  In its *ex parte* reexamination of the '288 patent, Schneider adopted the prosecution-history-driven construction it now disparages and applied that construction to the Colombi prior art, claim element by claim element, through its expert's sworn declaration.  Ex. 2 ('288 patent EPR Request) at 23–29; Ex. 11 ('288 patent EPR Decl. of Dr. Steven B. Leeb) ¶¶ 44–46.

Terms Schneider's expert applied with ease at the Patent Office cannot, in this Court, be reframed as too opaque for a POSA to understand.  Schneider's about-face is all the more striking because the claim language itself supplies the definitional framework.  Claim 1 recites:

> an input configured to (i) receive *first power from a utility source to power at least one load*, and (ii) receive second power from the utility source . . . an inverter configured to receive (i) when in a first mode, the first power and the second power, and (ii) when in a second mode, the second power and not the first power, wherein the *second power is used to power the inverter*

11

'288 patent at Claim 1.  Read in context, the meaning is plain: "first power" is the portion of utility power that powers the load, and "second power" is the portion that powers the inverter.  The claim itself ties each term to its function and recipient component—the load on the one hand, the inverter on the other—providing the relational, definitional structure required.

The specification aligns with the understanding the claim language provides.  It explains that the input "receives a first power to supply the transformer 35 and/or load 34," '288 patent at 11:44–45, and "also receives a second power to power the rectifier 40 and the inverter 42.  The second power is provided to the rectifier 40 and the inverter 42.  The inverter 42 receives the second power and not the first power when in the economy mode." *Id.* at 11:48–52.  Dependent claim 21 puts the matter beyond doubt: "the first power is a first portion of power received from the utility source at the input; and the second power is a second portion of the power received from the utility source at the input." *Id.* at Claim 21.  Together, the claims and specification make plain that "first power" and "second power" denote two functionally distinct portions of utility power, each routed to a different component within the UPS—the relational, structural framework *Nautilus* demands.

The prosecution history likewise is consistent with the way a POSA would understand the terms.  When the Examiner asked how a single utility source could produce two different "powers," the applicant explained: "[t]he utility source provides power including the first power and the second power.  The first power is a first portion of the power supplied and the second power is a second portion of the power supplied." Ex. 12 ('288 patent File History), Response to Non-Final Office Action dated July 18, 2016, at 11.  The Examiner accepted that explanation, withdrew the § 112 rejection, and allowed the claims. *Id.*, Notice of Allowability dated October 24, 2016.  That same explanation was the foundation of Schneider's EPR analysis.  Schneider told the Patent

Office that, "for purposes of this request," it would treat "'first power,' and 'second power' … as having the scope and relationship asserted by the Patent Owner during prosecution"—and then applied that very construction to map the limitations onto Colombi.  Ex. 2 ('288 patent EPR Request) at 23 n.3, 24; Ex. 11 ('288 patent EPR Decl. of Dr. Steven B. Leeb) ¶¶ 44–46.  Schneider has thus shown—both in its EPR papers and through its expert's sworn declaration—that a POSA can apply these terms with reasonable certainty using the very prosecution-history guidance Schneider now calls inadequate.  It produces no expert testimony in this Court to the contrary.  Its silence is unsurprising: its own retained expert has already opined the opposite, under oath, in this very patent family.  Schneider cannot meet its clear-and-convincing burden when it has admitted, by word and by deed, that the limitations are definite.

The Court should reject Schneider's indefiniteness theory and construe "first power" and "second power" according to their plain and ordinary meaning.

> ### iii.  "an inverter configured to receive (i) when in a first mode, the first power and the second power, and; (ii) when in a second mode, the second power and not the first power, wherein the second power is used to power the inverter" ('288 patent at Claim 1)

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning<br><br>Not indefinite | Indefinite |

This limitation is not indefinite, and again, Schneider's contrary position cannot be reconciled with how it treated the very same limitation before the Patent Office.  In its EPR Request, Schneider and its expert parsed this limitation into its two component modes and mapped each one, sub-element by sub-element, onto Colombi.  Ex. 2 ('288 patent EPR Request) at 27–29; Ex. 11 ('288 patent EPR Decl. of Dr. Steven B. Leeb) ¶¶ 49–53.  In other words, Schneider's own expert had no difficulty applying this limitation—with reasonable certainty—to the prior art.  A POSA

reading the claim in light of the specification would understand its scope just as readily.

The claim language itself supplies the definitional framework that Schneider's EPR papers acknowledged and applied. In the "first mode," the inverter receives both the first power and the second power—meaning the inverter is actively processing utility power and supplying it to the load. '288 patent at Claim 1. In the "second mode," the inverter receives the second power but not the first power—meaning the inverter remains energized and operational, but is not actively supplying load power; the second power keeps the inverter ready to take over if a fault arises. *Id.* The two modes are defined by operational criteria, anchored to identifiable inputs ("first power" and "second power"), an identifiable component (the inverter), and an identifiable function (powering the load versus standing by). That is precisely the kind of relational, structural framework that satisfies *Nautilus*, and it is the same framework Schneider and its expert applied when reading the limitation onto Colombi's two-feed-path architecture. Ex. 11 ('288 patent EPR Decl. of Dr. Steven B. Leeb) ¶¶ 49–53.

The specification confirms what the claim language and Schneider's EPR conduct already make plain. In the UPS mode, "power is supplied to the load 34 from the main AC source through the rectifier 40 and the inverter 42." '288 patent at 5:64–65. In the economy mode, "the inverter 42 receives the second power and not the first power" and "is available to provide power to the transformer 35 if a fault exists with the power supplied via the bypass switch 64." *Id.* at 11:50–52, 9:46–48. The intrinsic record provides objective boundaries that a POSA can readily apply. And once again, Schneider offers no expert testimony in this Court that a POSA would not understand the scope of this limitation—a silence that speaks loudly given that its own retained expert said something else to the Patent Office recently.

The Court should reject Schneider's indefiniteness argument and construe this limitation

14

according to its plain and ordinary meaning as understood by a POSA in light of the claims and specification.

> **iv. "receiving, via an inverter, (i) the first power and the second power when in a first mode, and (ii), the second power and not the first power when in a second mode, wherein the second power is used to power the inverter" ('288 patent at Claim 16)**

| DPW's Proposed Construction | Schneider's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Not indefinite | Indefinite |

DPW proposes that this limitation be given its plain and ordinary meaning and that it is not indefinite. This limitation is the method counterpart to the apparatus limitation in Claim 1 addressed above. For the same reasons set forth above, this method limitation is not indefinite. The Court should construe this limitation consistently with its apparatus counterpart and reject Schneider's indefiniteness argument.

> **v. "a control module configured to (i) detect a variable voltage at the output of the UPS a first plurality of times to provide a first plurality of voltages, (ii) Integrate the first plurality of voltages to generate a first sum, and (iii) subsequent to completing a transition from the second mode to the first mode, adjust an output voltage of the inverter based on the first sum to balance the variable voltage of the UPS, wherein the variable voltage of the UPS is provided based on the output voltage of the inverter" ('288 patent at Claim 1)**

| DPW's Proposed Construction | Schneider's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Not subject to 112(f)<br><br>To the extent the Court treats this term as subject to 112(f), DPW identifies the following function and structure:<br><br>**Function (not disputed)**: "a control module configured to (i) detect a variable voltage at the output of the UPS a first plurality of times to provide a first plurality of voltages, (ii) | Means-Plus-Function Term, subject to 112(f)<br>"module" is a nonce term<br><br>**Function**: "(i) detect a variable voltage at the output of the UPS a first plurality of times to provide a first plurality of voltages, (ii) Integrate the first plurality of voltages to generate a first sum, and (iii) subsequent to completing a transition from the second mode to the first mode, adjust an output voltage of the inverter based on the first sum to balance the variable voltage of the UPS, wherein the |

15

| | |
|---|---|
| Integrate the first plurality of voltages to generate a first sum, and (iii) subsequent to completing a transition from the second mode to the first mode, adjust an output voltage of the inverter based on the first sum to balance the variable voltage of the UPS, wherein the variable voltage of the UPS is provided based on the output voltage of the inverter" | variable voltage of the UPS is provided based on the output voltage of the inverter" |
| **Alternative Structure**: Any one of an ASIC, a discrete circuit, an integrated circuit, a combinational logic circuit, an FPGA, a processor (shared, dedicated, or group) that executes code, memory that stores code executed by the processor, other suitable hardware components, or a combination thereof, such as in a system-on-chip, programmed or configured to perform the recited control functions; and equivalents thereof. *See, e.g.*, '288 Patent at 13:45-54. | **Structure**: "UPS control module 38" |

DPW proposes that this term be given its plain and ordinary meaning and that "control module" is not subject to § 112(f). The legal framework and the reasoning here are the same as for "control module" in the '613 patent: the term does not use "means," which triggers a rebuttable presumption against § 112(f), *Williamson*, 792 F.3d at 1349. Schneider has again failed to overcome the presumption.

*First*, again, in its EPR Request on the '288 patent, Schneider treated "control module" as a structural term and never invoked § 112(f). Schneider repeatedly mapped the claimed "control module"—and described that component as "a processing circuit 180 and a storage medium 185, readable by the processing circuit 180, storing instructions for execution by the processing circuit for controlling the UPS 100." Ex. 2 ('288 patent EPR Request) at 106 (quoting Colombi at 3:48–52); *see also* Ex. 11 ('288 patent EPR Decl. of Dr. Steven B. Leeb) ¶¶ 57–58, 69, 74, 100–101.

*Second*, the claim language itself recites substantial structure. Claim 1 places the "control

module" within a defined UPS architecture, alongside named structural co-components: an "input" that receives first and second power, an "inverter" whose output voltage the control module adjusts, a "bypass circuit," and a "rectifier." '288 patent at Claim 1. The control module is then specified in terms of its relationship to that architecture: it is "configured to (i) detect a variable voltage at the output of the UPS a first plurality of times to provide a first plurality of voltages, (ii) integrate the first plurality of voltages to generate a first sum, and (iii) subsequent to completing a transition from the second mode to the first mode, adjust an output voltage of the inverter based on the first sum to balance the variable voltage of the UPS, wherein the variable voltage of the UPS is provided based on the output voltage of the inverter." *Id.* That is a defined hardware element with identified inputs (UPS output voltages sampled over time), identified outputs (commands adjusting the inverter's output voltage), and an identified internal operation (integration of sampled voltages to produce a sum used as the basis for the adjustment)—not an abstract functional black box. *See NextGen*, No. 2:22-cv-00307-JRG-RSP, Dkt. 235, at 27-31 ("control module" not subject to § 112(f) where the claim language "recites structure in support thereof" through connections to other named components).

*Third*, the specification removes any doubt that the claimed "module" is structural. The '288 patent provides the same express, structural definition of "module" as the '613 patent: "As used herein, the term module may refer to, be part of, or include an Application Specific Integrated Circuit (ASIC); a discrete circuit; an integrated circuit; a combinational logic circuit; a field programmable gate array (FPGA); a processor (shared, dedicated, or group) that executes code; other suitable hardware components that provide the described functionality; or a combination of some or all of the above, such as in a system-on-chip." '288 patent at 13:45-54. As with the '613 patent, that definition—one that identifies specific, well-known classes of

17

hardware components that a POSA would immediately recognize as structure—governs claim construction. Schneider and its expert had no trouble identifying that class of structures and mapping it onto Colombi's digital control system in the EPR—which, as Colombi describes and Schneider repeatedly quoted, is implemented through "a processing circuit 180 and a storage medium 185, readable by the processing circuit 180, storing instructions for execution by the processing circuit for controlling the UPS 100." Ex. 11 ('288 patent EPR Decl. of Dr. Steven B. Leeb) ¶¶ 90–91 (quoting Colombi at 3:48–52). That is the very ASIC/processor/storage class of structures the '288 patent's definition expressly contemplates.

Schneider cannot rebut the presumption against § 112(f) when (1) the '288 patent's specification expressly defines "module" in structural terms, (2) the claims situate the "control module" within a defined UPS architecture alongside named structural co-components, and (3) Schneider itself treated the term as structural—and applied it element by element—in its own EPR filings. The Court should hold that "control module" in the '288 patent is not subject to § 112(f) and should give it its plain and ordinary meaning.

### c. '250 patent

#### i. "power supply module" ('250 patent at Claims 1–10)

| DPW's Proposed Construction | Schneider's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Means plus function, subject to 112(f) "module" is a nonce term. |
| Not subject to 112(f) | |
| | **Function:** supplying power to a load |
| To the extent the Court treats this term as subject to 112(f), DPW identifies the following function and structure: | **Structure:** Fig. 1, item 102; Fig. 3; item 302; 4:17-37 |
| **Function**: supplying power to a load | |
| **Alternative Structure**: Any one of a UPS module (e.g., items 102, 302, 402, 502), or any other device capable of producing a quantity of electrical power including a | |

18

| generator, a DC power supply, or a motor generator; and equivalents thereof capable of performing the claimed power supply functions. *See, e.g.*, '250 Patent at 4:11-21; Figs. 1, 3, 4, 5. | |

"Power supply module" should be given its plain and ordinary meaning—exactly the way Schneider treated the term just months ago at the Patent Office. In its EPR of the '250 patent, Schneider neither identified "power supply module" for construction nor invoked § 112(f); instead, it parsed the limitation "a … power supply module having a controller" and mapped it, claim-element-by-claim-element, onto specific identifiable hardware in the prior art through a sworn expert declaration. *See* Ex. 3 ('250 patent EPR Request) at 18–22, 38–41; Ex. 13 ('250 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 49–55, 90–92. At no point in the EPR did Schneider suggest that "power supply module" was a nonce term, that it lacked structural meaning, or that it should be construed under § 112(f)—Schneider's newfound § 112(f) theory is a litigation invention. Because the claims do not use "means," there is a rebuttable presumption that § 112(f) does not apply. *Williamson*, 792 F.3d at 1349. Schneider cannot meet that burden on a record where its own expert has just sworn the opposite, and its § 112(f) theory fails for multiple independent reasons.

Schneider's § 112(f) theory isolates "module" from its surrounding context. That approach is wrong. *See Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007–09 (Fed. Cir. 2018) (reversing § 112(f) analysis where the court "removed the terms from their context, which otherwise strongly suggests the plain and ordinary meaning of the terms"). This Court likewise rejects efforts to evaluate "module" in isolation. *See NextGen*, No. 2:22-cv-00307-JRG-RSP, Dkt. 235, at 29-31 ("control module" not subject to § 112(f)).

Here, a POSA would understand "power supply module" to refer to a self-contained unit

19

that supplies electrical power, such as a UPS, generator, or DC power supply.  The term identifies a class of structures, which is sufficient to defeat § 112(f).  *See Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-cv-744-JRG-RSP, Dkt. 136, at 90–91 (E.D. Tex. Aug. 10, 2015) (recognizing that even if a term covers a broad class of structures or identifies structures by their function, that is sufficient to avoid means-plus-function treatment).  The '250 specification confirms exactly that.  It expressly identifies a class of well-known structures: "instead of a UPS module, the present disclosure could make use of one or more generators, DC power supplies, motor generators, or virtually any other device capable of producing a quantity of electrical power."  '250 patent at 4:11–16.  A POSA reading that disclosure would recognize "power supply module" as identifying a recognized class of physical, power-producing hardware—precisely the kind of structural class that defeats § 112(f).

The '250 specification reinforces this point by describing the "power supply module" in concrete, physical terms—as a defined assembly of identifiable hardware components, not as a functional placeholder.  The specification explains that the representative power supply module 302 "may include an input magnetics subsystem 304, an AC to DC converter 306, a backup power source 310, a DC to AC converter (i.e., inverter) 308 and an output magnetics subsystem 312," together with "a bypass switch 314 … incorporated between an input side of the input magnetics subsystem 304 and an output side of the output magnetics subsystem 312, and controlled via a signal from a controller 318."  '250 patent at 4:34–49.  These disclosures describe the "power supply module" as a tangible structure with named, interconnected physical components (magnetics subsystems, AC/DC and DC/AC converters, a backup power source, a bypass switch, and a programmable controller).

Schneider's own expert had no difficulty applying the term to that very class of structures

in his EPR declaration—mapping "power supply module" onto the prior art's discrete sub-modules. Ex. 13 ('250 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 49–55, 90–92.  Tellingly, Schneider offers no expert testimony—none—in this Court that a POSA would not understand "power supply module" to connote structure.  Its silence is unsurprising: its own retained expert has already said the opposite.

For these reasons, the Court should find that "power supply module" is not subject to § 112(f) and should be afforded its plain and ordinary meaning.

> ii.   **"and when needed, such that said controllers of said second and third power supplies increase the power outputs of their respective said power supply modules by different amounts, [when needed]" ('250 patent at Claims 1 and 8)**

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning<br><br>Not indefinite | Indefinite |

This term is not indefinite, and Schneider knows it.  In its EPR of the '250 patent, Schneider identified that very limitation as the only feature "which the Examiner did not find to be in the prior art" and built its entire petition around applying it—claim element by claim element—to the prior art through a sworn expert declaration.  Ex. 3 ('250 patent EPR Request) at 17–18, 64–67; Ex. 13 ('250 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 130–138.  Schneider and Dr. Baker walked through "when needed, such that said controllers of said second and third power supplies increase the power outputs of their respective said power supply modules by different amounts"— tracking the limitation verbatim—and identified the specific structures and operations in Li (with its "load share control circuit 124" adjusting each module's share according to "the respective values of their current sensing resistors"), the prior art that allegedly satisfied it.  A limitation that Schneider's own expert has read, understood, and mapped onto the prior art, in a sworn declaration

21

cannot in the same breath be too indefinite for a POSA to comprehend.

Schneider bears the burden of proving indefiniteness by clear and convincing evidence, *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011), and cannot carry that burden on a record where its own expert has already demonstrated the opposite.

Read in context, the meaning of the claim language is plain. The qualifier "when needed" identifies the conditions under which those increases must be "by different amounts" so that the second and third modules "assume different additional percentages" of the shed load—i.e., when operational conditions call for unbalanced load sharing—while leaving the modules free to share the load equally when conditions do not call for unbalanced sharing. The phrase therefore describes *when* a particular operational mode is invoked; it does not render the claim scope uncertain.

The specification confirms this reading, expressly contemplating both modes of operation: the "operations could be used to implement either balanced load shedding or unbalanced load shedding," depending on whether the modules are "controlled to accommodate equal portions" or "different percentages of the additional load." '250 patent at 8:20–27.

The prosecution history is consistent with this understanding. In adding this limitation, the applicant explained that the second and third modules assume the shed load "but not necessarily in equal percentages," and that the controllers have "the intelligence to adjust the amount of additional load that each picks up by a desired percentage to accommodate the shed load." Ex. 14 ('250 patent File History), Response to Non-Final Office Action dated June 9, 2011, at 10–11. The Examiner allowed the claims on that basis, and Schneider relied on the same prosecution-history framework to apply the limitation to the prior art in its EPR. Ex. 3 ('250 patent EPR Request) at 17–18; Ex. 13 ('250 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 130–138. Schneider

22

offers no expert testimony in this Court that a POSA would not understand the limitation's scope with reasonable certainty—an unsurprising silence given that its own retained expert recently swore the opposite.

Viewed in light of the claims, specification, and prosecution history, the scope of this limitation is readily ascertainable.  The Court should reject Schneider's indefiniteness argument.

### d.  '862 patent

#### i.  "triode for alternating current (TRIAC)" ('862 patent at Claims 1, 2, 3, 9, 10, 12, 16, 18, 19)

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "a bidirectional device consisting of an anode, cathode, and gate for controlling alternating current" |

"Triode for alternating current (TRIAC)" should be given its plain and ordinary meaning— and Schneider's effort to import limitations should be rejected.

The claim language recites "triode for alternating current (TRIAC)" without any structural qualifiers or operational requirements.  Nothing in the claim language requires a TRIAC to include an anode, cathode, gate, or bidirectional operation.  Schneider cannot rewrite the claims to add limitations the patentee deliberately omitted.

The specification reinforces this plain and ordinary meaning.  The specification consistently uses "triode for alternating current (TRIAC)" without adding structural limitations of the type Schneider now proposes.  *See, e.g.*, '862 patent, Abstract; Fig. 1; 1:39–49; 3:29–35. Indeed, the specification never mentions anode or cathode.  Instead, the specification repeatedly uses "TRIAC" in accordance with its ordinary meaning, which weighs heavily against importing additional limitations.  This uniform usage confirms that the patentee did not act as its own lexicographer or otherwise redefine the term.

The prosecution history is consistent with this understanding and provides no basis to

narrow the term. At no point did the applicant limit "TRIAC" to a device having an anode, cathode, and gate or to a device that must be bidirectional. Ex. 15 ('862 patent File History) Non-final Office Action dated September 28, 2010, Applicant's Remarks dated December 28, 2010, Notice of Allowance dated February 4, 2011. Nor did the applicant distinguish prior art on that basis. *Id.* The absence of any such disclaimer confirms that the term should retain its ordinary scope. Courts do not import limitations into claims absent a "clear and unmistakable" disavowal in the intrinsic record. *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797–98 (Fed. Cir. 2019).

Schneider appears to have derived its construction from a textbook definition, but that approach is inconsistent with governing claim construction principles, which require terms to be interpreted in light of the intrinsic record, not narrowed by extrinsic definitions. *See Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 871-72 (Fed. Cir. 2024) (courts "generally give claim terms their 'ordinary and customary meaning' to a relevant artisan as understood in light of the intrinsic evidence").

Schneider's attempt to rewrite the claims by adding structural limitations finds no support in the patent and should be rejected.

### ii. "token" ('862 patent at Claims 1, 2, 3, 6–13, 16–19)

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "object that represents permission" |

A POSA would readily understand the meaning of "token" from the claims and specification. The claims describe "token" in context: it is something whose "possession" is "transferred" between control logics, and voltage is applied to TRIACs "according to the possession of the token." '862 patent at Claim 1. Claim 19 further explains that each controller logic includes a "token counter," and that voltage is applied to TRIACs "according to a comparison

24

between" the token counters. '862 patent at Claim 19. These recitations provide a POSA with more than enough context to understand the meaning of "token" in the claims. *See Phillips*, 415 F.3d at 1314.

Nothing in the specification or prosecution history warrants narrowing "token" in the way Schneider proposes—there is no lexicography nor disclaimer. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning, unless the patentee explicitly redefines the term or disavows its full scope.").

*First*, the patentee never redefined or disavowed "token" to mean only an "object." To the contrary, the specification expressly contemplates non-object implementations, explaining that the token "may be implemented in the form of a token counter maintained by each of the master controller logic 101, first TRIAC controller logic 102A and the second TRIAC controller logic 102B." '862 patent at 4:25–28. Limiting "token" to an "object" would improperly exclude implementations where the token is represented by a counter value, a logical state, or similar non-object constructs. *Second*, the patentee never redefined or disavowed "token" to mean only a "permission." The word "permission" appears nowhere in the specification, and the specification describes the token's function more broadly—as an arbitration mechanism that coordinates control among multiple controller logics to prevent multiple TRIACs from being simultaneously enabled. *See* '862 patent at 3:36–40 ("as the current holder of the token, the first TRIAC controller logic 102A is the only controller authorized to enable its associated first TRIAC 103A").

The prosecution history likewise contains no disclaimer narrowing "token" to either an "object" or a "permission." *See* '862 patent File History, Non-Final Office Action dated September 28, 2010; Applicant's Remarks dated December 28, 2010; Notice of Allowance dated

February 4, 2011.

Because there is no disclaimer or lexicography, Schneider cannot restrict "token" to a subset of its ordinary meaning by requiring both that it be an "object" and that it represent "permission."

The Court should reject Schneider's construction and give "token" its plain and ordinary meaning.

> ### iii. "first controller logic" and "second controller logic" ('862 patent at Claim 19)

| DPW's Proposed Construction | Schneider's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning<br><br>Not subject to 112(f)<br><br>To the extent the Court treats this term as subject to 112(f), DPW identifies the following function and structure:<br><br>**Function:** Controlling a first/second TRIAC by applying a voltage to the gate of the first/second TRIAC according to a comparison between the first token counter and the second token counter<br><br>**Alternative Structure :** Any one of an ASIC, an FPGA, a DSP, an integrated circuit, one or more computer programs running on one or more computers or computer systems, one or more programs running on one or more processors or microprocessors, firmware, or virtually any combination thereof, programmed or configured to perform the recited control functions; and equivalents thereof. *See, e.g.,* '862 Patent at 8:6-30. | Means-plus-function, subject to 112(f)<br>"controller logic" is a nonce term<br><br>**Function:** Controlling a first/second TRIAC by applying a voltage to the gate of the first/second TRIAC according to a comparison between the first token counter and the second token counter<br><br>**Structure:** Fig. 1, items 102A, 102B, 108A, 108B; Fig. 3, item 310; Fig. 4, item 410; 2:51–55; 2:61– 3:1; 3:35–44; 4:7–60 |

The dispute here is whether "first controller logic" and "second controller logic" invoke means-plus-function claiming under § 112(f), or whether—as Schneider itself believed when it

filed its *ex parte* reexamination—they connote sufficiently definite structure to a POSA. The terms do not use "means," which triggers a rebuttable presumption that § 112(f) does not apply, *Williamson*, 792 F.3d at 1349, and Schneider cannot overcome that presumption on this record. In the '862 EPR, Schneider neither identified "controller logic" for construction nor invoked § 112(f); instead, it mapped "first controller logic" and "second controller logic" directly onto identifiable hardware in the prior art through a sworn expert declaration. Ex. 4 ('862 patent EPR Request) at 39–41, 70–72; Ex. 16 ('862 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 96–103, 153–155. At no point in the EPR did Schneider suggest "controller logic" was a nonce term in need of § 112(f) construction—Schneider's newfound § 112(f) theory is a litigation invention. *See Zeroclick*, 891 F.3d at 1008 ("the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions.").

The claim language and intrinsic record confirm what Schneider's EPR conduct already establishes. Claim 19 supplies further structural context: "wherein the first controller logic and the second controller logic are configured for applying a voltage to either a gate of the first TRIAC or a gate of the second TRIAC according to a comparison between the first token counter and the second token counter." '862 patent at Claim 19. Each controller logic includes a "token counter" and is "operably coupled" to a power source through a TRIAC, and both are operably coupled to a "master control logic" that itself is "operably coupled to a user interface." '862 patent at Claim 19. Each controller logic thus has identified inputs (token-counter values), identified outputs (gate voltages applied to its associated TRIAC), and identified relationships to other named structural components (the TRIAC, the power source, the master control logic, the user interface)—not an abstract black box. *See Mass. Inst. of Tech. & Elecs. For Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) (finding that the claim language "adds further structure by

27

describing the operation" of the claim term).

The specification confirms this understanding. The specification describes the "TRIAC controller logic 102A" and "TRIAC controller logic 102B" as distinct, identifiable class of structural components with specific functions. '862 patent at 2:52–60. Schneider and its expert had no trouble identifying the specification's identified class of structures in the EPR—mapping "controller logic" onto Li's discrete "controller 108" (with its arbitration mechanism and token counter) and Ravindra's discrete "TRIAC driver/ZCD" components (controlled by the discrete "control circuit 130"). Ex. 16 ('862 patent EPR Decl. of Dr. R. Jacob Baker) ¶¶ 96–100, 104–110. Tellingly, Schneider offers no expert testimony in this Court that a POSA would not understand "controller logic" to connote structure. Its silence is unsurprising: its own retained expert said the opposite.

The Court should find that "controller logic" is not subject to § 112(f) and should be given its plain and ordinary meaning.

## V.    CONCLUSION

For the foregoing reasons, DPW respectfully requests that the Court adopt DPW's proposed constructions and reject Schneider's litigation-driven positions.


Dated: May 5, 2026            Respectfully submitted,

> */s/ S. Giri Pathmanaban by permission Andrea L. Fair*
> S. Giri Pathmanaban (Texas Bar No. 24074865)
> **CLEARY GOTTLIEB STEEN & HAMILTON LLP**
> 1841 Page Mill Road
> Suite 250
> Palo Alto, CA 94304
> Telephone: (650) 815-4100
> Facsimile: (650) 815-4199
> gpathmanaban@cgsh.com
>
> Clement Naples (Appearance forthcoming)

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
cnaples@cgsh.com

Heather S. Nyong'o (Admitted Pro Hac Vice)
Thomas W. Yeh (Admitted Pro Hac Vice)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4400
Facsimile: (415) 796-4499
tyeh@cgsh.com
hnyongo@cgsh.com

Of Counsel:
Andrea Fair
Texas State Bar No. 24078488
Garrett Parish
Texas State Bar No. 24125824
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: (903) 757-6400
Facsimile: (903) 757-2323
andrea@millerfairhenry.com
garrett@millerfairhenry.com

*Attorneys for Plaintiff Data PowerWorks, LLC*

29

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2026, a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

/s/ *S. Giri Pathmanaban*
S. Giri Pathmanaban
